Frank J. KELLEY, Attorney General of the State of Michigan; and the State of Michigan, Plaintiffs,

v.

THOMAS SOLVENT COMPANY; Thomas Development, Inc.; Thomas Solvent Company of Detroit, Inc.; Thomas Solvent Company of Muskegon, Inc.; Thomas Solvent, Inc. of Indiana; TSC Transportation, Inc.; Richard E. Thomas; and Grand Trunk Western Railroad Company, Defendants.

and

GRAND TRUNK WESTERN RAILROAD COMPANY, Counter Plaintiff,

v.

Frank J. KELLEY, Attorney General of the State of Michigan; and the State of Michigan, Counter Defendants.

and

GRAND TRUNK WESTERN RAILROAD COMPANY, Cross Plaintiff,

v.

THOMAS SOLVENT COMPANY; Thomas Development, Inc.; Thomas Solvent Company of Detroit, Inc.; Thomas Sol-

vent Company of Muskegon, Inc.; Thomas Solvent, Inc. of Indiana; TSC Transportation, Inc.; and Richard E. Thomas, Cross Defendants.

and

THOMAS SOLVENT COMPANY and Richard Thomas, Counter Plaintiffs,

v.

GRAND TRUNK WESTERN RAILROAD COMPANY, Counter Defendant.

and

GRAND TRUNK WESTERN RAILROAD COMPANY, Third–Party Plaintiff,

v.

Richard E. THOMAS, as Trustee of The Richard E. Thomas Living Trust; the Richard E. Thomas Living Trust; and Letha Thomas, Third–Party Defendants.

UNITED STATES of America, Plaintiff,

v.

THOMAS SOLVENT COMPANY; Thomas Development, Inc.; Thomas Solvent Company of Detroit, Inc.; Thomas Solvent Company of Muskegon, Inc.; Thomas Solvent, Inc. of Indiana; TSC Transportation Company; Richard E. Thomas, and Grand Trunk Western Railroad Company, Defendants.

and

GRAND TRUNK WESTERN RAILROAD COMPANY, Cross Plaintiff,

v.

THOMAS SOLVENT COMPANY; Thomas Development, Inc.; Thomas Solvent Company of Detroit, Inc.; Thomas Solvent Company of Muskegon, Inc.;

Thomas Solvent, Inc. of Indiana; TSC Transportation Company; and Richard E. Thomas, Cross Defendants.

and

THOMAS SOLVENT COMPANY and Richard Thomas, Counter Plaintiffs,

v.

GRAND TRUNK WESTERN RAILROAD COMPANY, Counter Defendant.

and

GRAND TRUNK WESTERN RAILROAD COMPANY, Third–Party Plaintiff,

v.

Richard E. THOMAS as Trustee of The Richard E. Thomas Living Trust; Richard E. Thomas Living Trust; and Letha Thomas, Third–Party Defendants.

Nos. K86–164, K86–167.

United States District Court, W.D. Michigan.

Dec. 13, 1989.

Frank J. Kelley, Atty. Gen. by Robert P. Reichel, Asst. Atty. Gen., Environmental Protection Div., Lansing, Mich., for plaintiffs and counter defendants.

Foster, Swift, Collins & Coey, P.C. by Charles E. Barbieri, John L. Collins, Lansing, Mich., for Thomas Solvent Co. and Richard E. Thomas.

Sullivan, Hamilton & Schulz by James M. Sullivan, Battle Creek, Mich., for Thomas Solvent Co. of Detroit, Inc., Thomas Solvent, Inc. of Indiana, TSC Transp. Inc., Thomas Solvent Co. of Muskegon, Inc. and Thomas Development, Inc.

Bodman, Longley & Dahling by Frederick J. Dindoffer, R. Craig Hupp and Mary P. Sclawy, Detroit, Mich., for Grand Trunk Western R. Co.

John S. Smietanka, U.S. Atty. by Julie Ann Woods, Asst. U.S. Atty., Grand Rapids, Mich., Joel M. Gross and Steven J. Willey, Environmental Enforcement Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C. (Roger Grimes and Jesse A. Goldfarb, Asst. Regional Counsel, U.S. E.P.A., Chicago, Ill., of counsel), for the U.S.

Bremer, Wade, Nelson & Alt by Michael D. Wade, Grand Rapids, Mich., for Great American Surplus Lines Ins. Co.

Farr & Oosterhouse by Kenneth R. Oosterhouse, Grand Rapids, Mich., amicus curiae, for General Foods Corp., Essex Group, Inc., BASF Corp., Tyler Refrigeration Corp., G.F. Corp., Clark Equipment Co., Reichold Chemical, Inc., Miles Laboratory, Inc., Hoover Universal, Inc., Starcraft Corp., Lear Siegler, Inc., Twin Y Corp. and Acme Printing Ink Co.

Patton, Boggs & Blow by J. Gordon Arbuckle, John C. Martin and David J. Farber, Washington, D.C., amicus curiae, for General Foods Corp., Essex Group, Inc. and BASF Corp.

## OPINION

ENSLEN, District Judge.

Currently before me is a motion for partial summary judgment filed on January 27, 1988 by plaintiffs, the United States and the State of Michigan, to establish the joint and several liability of defendants Thomas Solvent Company ("Thomas Solvent"), Richard E. Thomas ("R. Thomas"), and Thomas Development Company ("Thomas Development") for response costs incurred by plaintiffs after groundwater contamination was discovered in Battle Creek, Michigan. While this motion was also originally brought against Grand Trunk Western Railroad Company ("Grand Trunk") as well, plaintiffs and defendant Grand Trunk entered into a partial consent decree and judgment in June of 1989 which established Grand Trunk's liability for contamination of three Battle Creek sites—the Verona Well Field, the Annex, and the Marshalling Yard. Plaintiffs seek a judgment that defendants Thomas Solvent, R. Thomas, and Thomas Development are jointly and severally liable for plaintiffs' response costs, but they do not at this time ask for a determination of the amount of recoverable costs.

## BACKGROUND

FACTS

Many of the facts in this case are not in serious dispute. The following is a summary of the important background facts; other facts will be discussed in the context of the liability issues.

*Verona Well Field*

The Verona Well Field provides the primary public water supply to over 35,000 residents—in addition to industries and commercial establishments in and around Battle Creek, Michigan. The Well is located in the northeast corner of the City. The Well Field consists of three wells on the west side of the Battle Creek River and thirty wells and a major water pumping station on the east side of the River. As part of the normal operation of the Well Field, water produced from the individual supply wells is collected and mixed by one integrated system into a single, main supply line.

In August 1981, the Calhoun County Health Department collected, and the Michigan Department of Public Health

("MDPH") laboratory analyzed, a water supply sample from a church located at 475 North Washington Street, Battle Creek. That analysis detected several volatile organic chemicals. After the MDPH determined that the water in question was supplied by the City of Battle Creek water system, the MDPH collected and analyzed water samples from the Verona Well Field. That initial sampling of the Verona Well Field detected volatile hydrocarbons, including trichloroethylene (TCE); 1, 2 dichloroethylene (1, 2 DCE); perchloroethythene (PCE, also referred to as tetrachloroethylene); and 1, 1, 1 tricholorethane (1, 1, 1 TCA).

MDPH began periodic sampling of the combined Verona Well Field supply line and of individual supply wells within the Field in September 1981. At that time, ten of the then-existing supply wells were found to be contaminated. The City, in consultation with the MDPH, thereafter removed several contaminated wells from service. Beginning in October 1981, as part of the effort to determine the contamination affecting the Verona Well Field, the Calhoun County Health Department and the MDPH collected and analyzed samples from numerous private residential and commercial water supply wells in the vicinity of the Well Field. By June 1982, that testing detected various volatile hydrocarbons in more than seventy private wells in the area. MDPH and the County Health Department provided written notice of the contamination to the well owners involved and advised them not to use the water for drinking, cooking, and where concentrations were especially high, bathing.

Then, in late 1981, the Michigan Department of Natural Resources ("MDNR") initiated an investigation to determine the sources of the groundwater contamination. Investigators inspected the industrial and commercial facilities using solvents in the vicinity of the Verona Well Field, collecting and analyzing soil samples from those facilities. The MDNR identified potential sources of the contamination, which included facilities of the defendants, Thomas Solvent and Grand Trunk, commonly referred

to as the "Annex" and "Raymond Road" facilities.

At the State's request, the Environmental Protection Agency ("EPA") provided a Technical Assistance Team ("TAT") to assist in the investigation. In February and March 1982, the TAT contractor installed several groundwater monitoring wells to determine the extent and source of the contamination. The June 1982 TAT report, showed a plume (or plumes) of groundwater contamination in the Verona Well Field and surrounding area which emanated from the vicinity of the Annex and Raymond Road facilities. In June and July 1982, the MDNR and a consultant retained by Thomas Solvent collected and analyzed soil samples from those two sites. Both sets of those analyses confirmed that volatile hydrocarbons had been released into soils at the Annex and Raymond Road sites.

### Raymond Road Facility

From its incorporation in 1963, until 1984, defendant Thomas Solvent operated a facility located at 1180 North Raymond Road in Battle Creek as its principal place of business. It was engaged in the business of selling and transporting industrial solvents and other chemicals and transporting liquid industrial wastes to recycling and disposal facilities. The Raymond Road facility included an office building, a warehouse, a dock used for storing drums, an area used for mixing chemicals and twenty-one underground storage tanks ranging between 4,000 and 15,000 gallons in capacity.

Hazardous substances were released into soils and groundwaters at the Raymond Road site. Deposition testimony of Richard Thomas and former Thomas Solvent employees suggests that such releases occurred through various means, including: dumping solvents on the ground, rinsing out drums, leaking and spilling from transfer hoses, over-filling storage tanks and rinsing out tank trucks. A plume or plumes of groundwater contamination emanating from the Raymond Road site has polluted groundwaters in and around the Verona Well Field. Defendant Thomas Development owned the Raymond Road site

from January 1975 until January 1984, and during that time, leased it to Thomas Solvent. In January 1984, ownership was transferred to Thomas Solvent.

*Annex Facility*

From its incorporation in 1963 until 1984, Thomas Solvent operated an additional facility, the Annex, located on Emmett Street, a short distance to the west from the Raymond Road facility. The Annex included two underground bulk storage tanks, one above-ground storage tank, a loading rack and a loading dock adjacent to a rail spur. Thomas Solvent employees used the Annex for, among other things, unloading chemicals from railroad tank cars and storing bulk chemicals and drums containing solvents and liquid industrial wastes. The Annex facility was located on land leased by Thomas Solvent from defendant Grand Trunk and contiguous property also owned by Grand Trunk.

Hazardous substances were also released into the environment at the Annex. Tests of soil and groundwater samples from the Annex site have confirmed the presence of volatile organic chemicals, including many of the contaminants detected in the Verona Well Field and nearby private wells.

These substances were released into soil and groundwater at the Annex by various means, including: leaking and spilling drums of liquid waste, rinsing out drums and tank trucks on the ground, spilling from transfer hoses, and dumping solvent mixtures onto the ground.

Furthermore, plaintiffs observe that investigations conducted for EPA have indicated that groundwater near the Annex and Raymond Road facilities would tend to flow toward the Verona Well Field. Some organic compounds released at the Annex have migrated into the Well Field. By 1982 at the latest—and perhaps before—groundwater contamination originating at the Annex was migrating toward the Well Field.

*Government Response Actions*

Both the United States and the State have undertaken a number of response activities—in addition to testing and investigation—at the Verona Well Field site. Be-tween November 1982 and May 1983, the MDNR arranged for a program to supply bottled water to nearby residents whose private wells had been contaminated. Beginning in June 1983, EPA paid for a continuation of that program until all affected or threatened residences could be provided a permanent water supply replacement. Also in 1983, MDNR paid for construction and operation of temporary public shower facilities for owners of contaminated private wells.

In January 1984, the State brought a civil action in the Calhoun County Circuit Court, *Frank J. Kelley, et al. v. Thomas Solvent Company* (No. 84–72–CE) to abate the continuing release of hazardous substances at the Raymond Road and Annex facilities. Following an evidentiary hearing, the Circuit Court entered a Preliminary Injunction to Abate Public Nuisance on February 27, 1984 which, *inter alia,* prohibited the continued handling and storage of certain hazardous chemicals at those sites and required Thomas Solvent to empty and test twenty-one underground storage tanks for leaks.

After further hearings, the State requested and obtained a second injunction order, entered May 2, 1984, requiring Thomas Solvent to take additional measures to abate continuing groundwater contamination at the Raymond Road and Annex sites. Those decisions were affirmed by the Michigan Court of Appeals in *Attorney General v. Thomas Solvent,* 146 Mich. App. 55, 380 N.W.2d 53 (1985), *leave denied* 425 Mich. 880 (1986), but the second order was not enforced because of bankruptcy proceedings initiated by Thomas Solvent.

Periodic testing of the Verona Well Field by the MDPH demonstrated that contamination progressively spread farther into the Verona Well Field after the initial discovery of the contamination in 1981. By February 1984, the number of wells in which volatile hydrocarbons had been detected had increased from ten to twenty-seven.

EPA then began the ongoing Remedial Investigation/Feasibility Study ("RIF Study") at the Verona Well Field site in November 1983 to fully determine the nature and extent of the contamination and to evaluate the options for cleaning it up. The preliminary data collected confirmed that, the MDPH concluded, contamination had spread to almost all of the supply wells in the Verona Well Field by February 1984.

Under those circumstances, EPA performed a Focused Feasibility Study ("FF Study") to assess the endangerment to public health and examine the options for halting the spread of contamination within the Well Field. Based upon that FF Study, EPA, with the concurrence of the State, selected an Initial Remedial Measure ("IRM") to address the deteriorating condition of the Well Field. On May 1, 1984, the Acting Regional Administrator of EPA signed a Record of Decision which described the selected action. The remedial measure selected was to develop three new water supply wells north of the existing Well Field to augment the municipal supply and to use selected existing wells within the Well Field to purge or "blocking" wells to block the continued migration of contaminants from both the south and east. Contaminated water pumped from the blocking wells was treated temporarily with carbon filter beds and thereafter by an air stripping treatment system. Contractors paid by EPA and the State (on a 90%/10% match basis) completed construction of this IRM by August 1984.

On June 17, 1985, EPA completed a Phased Feasibility Study ("PFS") which examined the remedial alternatives to control soil and groundwater contamination which had been discovered at the Raymond Road facility. The PFS recommended a combination groundwater extraction and soil vapor extraction system at the Raymond Road site. On August 12, 1985, after a public comment period, EPA issued a second Record of Decision for the source control operable unit. The State has concurred in that decision and is providing matching funds for construction of the system. The groundwater extraction system began operation in February, 1987 and implementation of the soil vapor extraction system is ongoing.

In addition to the response actions identified above, the plaintiffs have incurred substantial costs for other response actions involving the Verona Well Field site which are not yet completed. For example, the EPA, along with the State, will continue to assess the need for remedial action at the Annex and the necessity for further remedial action at the Well Field. Oversight costs for both of the remedial measures undertaken to this date have been incurred and enforcement costs related to the government's prosecution of this case continue as well.

*Summary Judgment Standard*

In considering a motion for summary judgment, the narrow questions presented to this Court are whether there is "no genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." F.R.Civ. Proc. 56(c). The Court cannot try issues of fact on a Rule 56 motion, but is empowered to determine only whether there are issues to be tried. *In re Atlas Concrete Pipe, Inc.*, 668 F.2d 905, 908 (6th Cir.1982).

The moving party has a right to summary judgment where that party is able to demonstrate, prior to trial, that the claims of the plaintiff have no factual basis. *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As the Supreme Court held in *Celotex*, "... the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. Moreover, the Court must read the allegations of the complaint in the light most favorable to the non-moving party. *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir.1983). Where, as here, the moving party has supported its motion with affidavits and other documents, the non-moving party may not rest on the mere

allegations or denials of the pleadings, but must set forth "specific facts showing that there is a genuine issue for trial." F.R.Civ. Proc. 56(e); *Davis v. Robbs,* 794 F.2d 1129, 1130 (6th Cir.1986).

The standard for granting a motion for summary judgment is essentially the same as that for granting a motion for a directed verdict. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party is not entitled to summary judgment where there is sufficient evidence to allow a reasonable jury to return a verdict for the non-moving party. *Id.* 477 U.S. at 248–50, 106 S.Ct. at 2510–11, 91 L.Ed.2d at 211–12. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* 477 U.S. at 255–56, 106 S.Ct. at 2513–14, 91 L.Ed.2d at 216. With this standard in mind, the Court will review the arguments presented by both parties.

## DISCUSSION

Defendants Thomas Solvent, R. Thomas, and Thomas Development (collectively "defendants") have joined in opposition to this motion. Defendants make a number of objections to the motion in the form of defenses that have been repeatedly rejected by courts hearing CERCLA claims.

1. Plaintiffs' claims are barred by the applicable statute of limitations and/or laches;

2. Plaintiffs' claims are subject to equitable defenses such as unclean hands, failure to do equity, and estoppel;

3. Summary judgment is inappropriate where an issue of fact remains as to whether CERCLA is retroactively permissible; and

4. Defendants are entitled to a third-party defense.

Defenses one through three provide no defense here. It is well-established that CERCLA liability is strict liability, subject only to the limited defense in section 107(b)(4) of the Act. This Court, furthermore, has resolved the applicability of defenses one through three in its opinion on plaintiffs' motion to strike dated June 15, 1989. *See Kelley v. Thomas Solvent Co.,* 717 F.Supp. 507 (W.D.Mich.1989).

*Third Party Defense*

Section 107(b)(3) [1] provides, in conjunction with the definition of "contractual relationship" at Section 101(35), that an otherwise liable party can escape liability if it can prove, by a preponderance of the evidence, (1) that a third party was the *sole* cause of the release of hazardous substance; (2) that the third party was not the defendant's employee or agent; (3) that the act or omission of the third party causing the release did not occur in connection with a contractual relationship, existing either directly or indirectly, with the defendant seeking to claim the defense; (4) that the defendant exercised due care with respect to the hazardous substance concerned; and

---

1. Section 107(b) provides that:

(b) Defenses. There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

(1) an act of God;

(2) an act of war;

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual ar-

rangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b)(1)–(4).

(5) that the defendant took precautions against foreseeable acts or omissions of the third party who was the sole cause of the release. Unless a defendant can prove each of these elements, it is not entitled to claim the third party defense and, hence, it has no defense to liability under Section 107(a).

Defendants argue that Section 107(b)(3) provides them a defense because the contamination was caused by a third party, not in a contractual relationship with defendants, and the defendants exercised due care. They also suggest that "that bulk of contamination was caused by the pumping activity of the Verona Well Field, which was controlled by the local, state, and federal governments." Brief in Opposition, at 7 (March 18, 1988).

■ To begin with, I note that defendants have omitted a vital word from § 107(b)(3)—that the release must be caused *solely* by a third party. In addition, plaintiffs properly characterize this argument as an attempt to "blame the victim for being victimized." Plaintiffs' Reply, at 14 (April 27, 1988). Defendants have not shown any evidence, nor have they argued, that a third party was the *sole* cause of the release and concomitant harm. The facts are undisputed that hazardous substances were released into soil and groundwater at the Raymond Road site. *E.g.,* Clark Deposition, at 90 (fill lines with hazardous substances drained onto ground); Horner Deposition, at 4 & Ex. 2 (hazardous chemical leaked at rate of .232 gallons/hour and .556 gallons/hour); R. Thomas Deposition, at 46–48 (during cleaning of drums, chemicals "dumped" onto soil). The same is true for the Annex site. *E.g.,* Gunyan Deposition, at 50–52 (loads of thirty 55–gallon drums of waste solvents dumped at Annex). Moreover, hazardous wastes released at the Raymond Road and Annex facilities have contaminated the Verona Well Field, ac-

cording to analyses performed during the EPA's investigation. At a minimum, these defendants do not dispute that volatile organic compounds in groundwater from the Raymond Road facility have entered the Well Field. *See also* Minning Deposition, at 27–28; Swanson Deposition, at 210–22. These compounds have also migrated from the Annex to the Well Field. Quinn Affidavit ¶¶ 14.2, 3; Minning Deposition, at 28.

In sum, there is a great deal of evidence demonstrating that a third party was *not* solely responsible for the releases at these sites. The Court also observes that defendants were unable to answer interrogatories asking how City employees had solely caused the releases. *See* Thomas Solvent's Answers to Interrogatories No. 3(b). The claimed § 107(b)(3) defense, admittedly a difficult one to prove, is thus not available to defendants here, because there is no genuine issue of material fact as to whether it applies to the facts here—it does not.[2]

In general, in order to establish liability under CERCLA, the government must prove essentially four elements under § 107. That section provides as follows:

§ 9607. Liability

(a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

---

**2.** Courts construe CERCLA's limited defenses narrowly to effectuate the Act's broad policies. *E.g., New York v. Shore Realty Corp.,* 759 F.2d 1032, 1048–49 (2d Cir.1985) ("limited exception" for release caused solely by third party); *Pinole Point Properties, Inc. v. Bethlehem Steel Corp.,* 596 F.Supp. 283, 286, 288 (N.D.Cal.1984) (language of § 107(a) "extremely broad and inclusive" while stating a "severe limitation" on available defenses); 126 Cong.Rec. H11, 787 (Dec. 3, 1980) (liability subject only to 107(b) defenses "with third party being narrowly defined"). *See generally* Note, *Toxic Waste Litigation,* 99 Harv. L.Rev. 1348, 1544–45 (1986).

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan.

42 U.S.C. § 9607.

Plaintiffs must prove then that: 1) defendants are, or were at the time of disposal, the owners or operators; 2) of a facility; 3) at which there was a release or threatened release of a hazardous substance; and 4) which caused the government to incur response costs. *Id.; United States v. Northernaire Plating Co.,* 670 F.Supp. 742, 746 (W.D.Mich.1987); *United States v. Stringfellow,* 661 F.Supp. 1053 (C.D.Cal.1987); *United States v. Wade,* 577 F.Supp. 1326 (E.D.Pa.1983).

■ Liability for response costs under CERCLA is strict liability. *See J.V. Peters & Co. v. EPA,* 767 F.2d 263, 266 (6th Cir. 1985); *New York v. Shore Realty,* 759 F.2d 1032, 1044 (2d Cir.1985); *United States v. Conservation Chemical, Co.,* 619 F.Supp. 162, 204 (D.C.Mo.1985); *United States v. Ward,* 618 F.Supp. 884, 893 (E.D.N.C.1985).

1. *Owner or Operator*

Section 107(a)(1) imposes liability on current owners or operators of facilities. Similarly, under section 107(a)(2), any person who owned or operated a facility at the time hazardous wastes were disposed is liable for response costs incurred at the facility. 42 U.S.C. § 9607(a)(2); *New York v. Shore Realty Corp.,* 759 F.2d at 1043–44.

■ Thomas Solvent is the owner and operator of the Raymond Road facility and was the operator of the Annex facility at the time of the disposal of hazardous waste. The company acquired title to Raymond Road in 1984, and it operated that facility as well as the Annex facility for years before, until the facilities were abandoned when the company was liquidated in bankruptcy. CERCLA provides that an owner or operator in the case of any abandoned facility is "any person who owned, operated, or otherwise controlled activities at such facility" immediately beforehand. 42 U.S.C. § 9601(20)(A). Defendant Thomas Solvent does not dispute these facts; indeed they are admitted in the Answer.

Likewise, Thomas Solvent falls within the parameters of § 107(a)(1) due to the fact that it owned and/or operated these facilities at the time of the disposal of hazardous wastes. As is discussed, *infra,* in section 3 on release of hazardous substances, there is ample undisputed evidence supporting this element as well.

Thomas Development was the owner of the Raymond Road facility prior to January 1984. At numerous times prior to 1984, releases of hazardous substances occurred. For one example, on at least two occasions prior to 1984, perchloroethythene was spilled when an underground tank was overfilled. Clark Deposition, at 85. *See also infra* section 3 on release of hazardous substances.

R. Thomas may also be an "owner or operator" under § 107(a). On this issue, I adopt the reasoning of my opinion in *Kelley v. Arco,* 723 F.Supp. 1214, 1217–1220 (W.D.Mich.1989), as set forth below.

Under 42 U.S.C. § 9601(20)(A), the term "owner or operator" means "in the case of an ... offshore facility, any person owning or operating such facility." "Person" includes an "individual, firm, corporation, association, partnership ... commercial entity...." *Id.* at § 9601.

Although CERCLA does not explicitly address whether a court may hold a corporate officer liable for clean-up costs, nor does it set forth any standard, many courts addressing the issue have held that corporate officers may be individually liable for hazardous waste clean-up under CERCLA.[3]

---

3. At least one court has read the § 107 language "owner or operator" quite literally. In *Idaho v. Bunker Hill Co.,* the district court cited with approval an interpretation of § 107 which suggested a person who owns an interest in a corporation and is actively managing or operating it qualifies the individual as an "owner or operator." 635 F.Supp. 665 (D.Idaho 1986). The *Idaho* court went on to compare the "owner and operator" language in an analogous statute to CERCLA, writing that an "owner or operator" of a facility demonstrates:

Indeed, the weight of authority interprets CERCLA as providing an effective means of achieving its statutory goals by imposing individual liability under certain circumstances. *See New York v. Shore Realty*, 759 F.2d 1032 (2d Cir.1985); *Vermont v. Staco, Inc.*, 684 F.Supp. 822 (S.D.Vt.1988); *United States v. Northernaire Plating*, 670 F.Supp. 742 (W.D.Mich.1987); *United States v. Ward*, 618 F.Supp. 884 (E.D.N.C. 1985); *U.S. v. Mottolo*, 629 F.Supp. 56 (D.N.H.1984); *U.S. v. Carolawn Co.*, 14 Env't L.Rep. 20,699 (D.S.C. June 15, 1984). *Accord Idaho v. Bunker Hill*, 635 F.Supp. 665 (D.Idaho 1986) (dicta). *But see Joslyn Corp. v. T.L. James and Co.*, 696 F.Supp. 222 (W.D.La.1988).

I believe that CERCLA's statutory scheme varies the configuration of traditional corporate principles which prevent individual liability absent a conclusion that an individual engaged in procedural irregularities justifying a court in "piercing of the corporate veil" or that an individual has had close, active involvement or direct supervision in the events leading to the alleged tortious harm.[4] *See, e.g., Shore Realty*, 759 F.2d at 1052; *Mottolo*, 629 F.Supp. at 60; H. Henn, *Law of Corporations* § 218, 230 (2d ed. 1970). *But see Joslyn Corp.*, 696 F.Supp. 222. Courts have not hesitated to hold corporate individuals personally liable for unlawful hazardous waste practices. In *United States v. Northeastern Pharmaceutical & Chemical Co. ("NEPACCO")*, 810 F.2d 726 (8th Cir.1986), the president and major shareholder of NEPACCO was held liable as a "generator" under the Resource Conservation and Recovery Act ("RCRA") despite a finding that he had no knowledge of the plan to dispose of hazardous waste, nor was he present at the plant during the period of waste disposal. The Eighth Circuit observed that its "analysis of the scope of personal liability under the RCRA is similar to our analysis of the scope of individual liability under CERCLA." *Id.* at 745. The Court reasoned that although the president was "not personally involved in the actual decision to transport and dispose of the hazardous substances," he in fact

---

The *capacity* to make timely discovery of [unlawful] discharges. . . . the *power* to direct the activities of persons who control the mechanisms causing the pollution. . . . [and] the *capacity* to prevent and abate damage.

*Id.* at 672 (quoting *Apex Oil Co. v. United States*, 530 F.2d 1291, 1293 (8th Cir.1976) (emphasis added)). The court in *Idaho* went on to apply this "owner-operator" definition to a parent corporation where there had been a discharge by its subsidiary.

**4.** In *Berger v. Columbia Broadcasting System, Inc.*, 453 F.2d 991, 994 (5th Cir.1972), the Fifth Circuit discussed the importance of the corporate structure:

It is elemental jurisprudence that a corporation be a creature of the law, endowed with a personality separate and distinct from that of its owners, and that one of the principal purposes for legal sanctioning of a separate corporate personality is to accord stockholders an opportunity to limit their personal liability. *See also Baker v. Raymond International, Inc.*, 656 F.2d 173, 179 (5th Cir.1981) ("[t]he principal of limited liability remains a dominant characteristic of American corporate law."), *cert. denied*, 456 U.S. 983, 102 S.Ct. 2256, 72 L.Ed.2d 861 (1982); *Krivo Indus. Supply v. National Distillers and Chemical Corp.*, 483 F.2d 1098, 1102 (5th Cir.1973) ("the corporate form . . . is not lightly disregarded since limited liability is one of the principal purposes for which the law has

created the corporation.") In *Cort v. Ash*, 422 U.S. 66, 84, 95 S.Ct. 2080, 2091, 45 L.Ed.2d 26 (1975), the Supreme Court refused to create a federal private right of action for allegedly illegal corporate campaign contributions holding that:

Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law expressly requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation.

I find more support for displacing traditional, state-created corporate liability standards here, although I agree that "[w]hether latent federal power should be exercised to displace state law is primarily a decision for Congress." *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966). I observe that the literal language of § 107, "owner or operator" suggests that Congress did not intend to exclude a "person" who owns a company (versus who has an ownership interest) or who operates a company. The use of the exception narrows the definition of "owner." *See* 42 U.S.C. § 9601(20)(A) ("owner or operator" excludes "a person who, without participating in the management of a facility, hold indicia of ownership primarily to protect his security interest in the facility."). *See also Shore Realty*, 759 F.2d at 1052; *U.S. v. Carolawn*, 14 Env't L.Rep. at 20,700.

was "in charge of and directly responsible for all of NEPACCO's operations ... and he had the ultimate authority to control the disposal of NEPACCO's hazardous substances." *Id.* at 744.

In a Second Circuit case, the court held the principal officer and shareholder liable as an operator under § 107 of CERCLA where a close corporation purchased contaminated property, but did not actually dispose of hazardous substances. *New York v. Shore Realty,* 759 F.2d 1032 (2d Cir.1985). As in *NEPACCO,* the *Shore Realty* court found the vital factor to be as follows: the corporate official "is in charge of the operation of the facility in question, and as such is an 'operator' within the meaning of CERCLA." *Id.* at 1052.

A number of district courts have also premised liability on the factor of control or authority. A recent Vermont case imposed personal liability on the officers of the close corporation because they were managing stockholders. *Vermont v. Staco, Inc.,* 684 F.Supp. 822 (S.D.Vt.1988). Another individual defendant was held liable as a manager who directed the operations of the plant that released the contamination, whereas the managing shareholders participated in general management and control of the corporation, making "decisions that relate to the managing business and the marketing business and the selling businesses and all the overall operations of the company." *Id.* at 831–32 (citing Deposition of Robert Sirkus, at 12 (June 11, 1984)). In addition, in *United States v. Ward,* the court found the corporate president and principal shareholder liable under CERCLA § 107(a)(3) as a generator even without a finding of a knowing involvement by the individual defendant. Under circumstances similar to these cases, the court in *United States v. Carolawn Co.,* 14 Env't L.Rep. 20,699 (D.S.C.1984) held three corporate officers personally liable under CERCLA.

 I agree with the weight of authority that, in some circumstances, under CERCLA or related statutory schemes, a court may find an individual personally liable for unlawful hazardous waste practices where strict traditional corporate principles do not apply. Thus I rely in general upon *NEPPACO,* 810 F.2d 726; *Shore Realty,* 759 F.2d 1032; *Vermont v. Staco, Inc.,* 684 F.Supp. 822; *United States v. Ward,* 618 F.Supp. 884; *United States v. Carolawn Co.,* 14 Env't L.Rep. 20,699; *Idaho,* 635 F.Supp. 665 (dicta). More specifically, there are a number of recurring factors in these cases from which a standard for individual corporate liability can be identified. After distilling the facts supporting liability in this line of cases, I believe that a court under the circumstances before me should weigh the factors of the corporate individual's degree of authority in general and specific responsibility for health and safety practices, including hazardous waste disposal. These factors should be applied in order to answer the question of whether the individual in the close corporation could have prevented or significantly abated the hazardous waste discharge that is the basis of the claim. Although liability under CERCLA is essentially a strict liability scheme, the case law indicates that where CERCLA seeks to impose liability beyond the corporate form, an individual's power to control the practice and policy of the corporation, and the responsibility undertaken by that individual in this area should be considered.

Such an analysis appears to me to be appropriate. Imposing liability on a corporate individual is a serious matter, and because CERCLA provides no explicit way to distinguish among corporate actors, the courts should respond with proper standards. Strict liability may be too harsh and broad-sweeping a standard to apply to all corporate "owners" in all cases. Not all employees or managers of a close corporation will necessarily, absent special factors, be liable for a § 107 claim. Consequently, a more definitive standard seems appropriate.

This Court will look to evidence of an individual's authority to control, among other things, waste handling practices—evidence such as whether the individual holds the position of officer or director, especially where there is a co-existing management

position; distribution of power within the corporation, including position in the corporate hierarchy and percentage of shares owned. Weighed along with the power factor will be evidence of responsibility undertaken for waste disposal practices, including evidence of responsibility undertaken and neglected, as well as affirmative attempts to prevent unlawful hazardous waste disposal. Besides responsibility neglected, it is important to look at the positive efforts of one who took clear measures to avoid or abate the hazardous waste damage. Therefore the Court will look to this evidence when determining liability by the "prevention" test.

■ The standard I have articulated is quite unlike the lack of corporate formalities associated with piercing the corporate veil, and is different from the issue of personal knowledge, direct supervision, or active participation found in most ordinary torts by corporate actors. Here the focus on the inquiry is whether the corporate individual could have prevented the hazardous waste discharge at issue. Thus power or authority will be analyzed, a factor not used in the traditional standards for tortious conduct by corporate individuals. Secondly, the Court, in determining individual liability under § 107, will look at responsibility undertaken for waste disposal practices as it relates to the prevention test. Here active, direct, knowing efforts to prevent or abate the contamination may work for—not against—a corporate defendant where the acts suggest the individual tried but was unable to prevent or abate the unlawful waste disposal. Also the second factor examines explicit responsibility undertaken—through a job description or more informal acceptance—as a means of determining one's ability to prevent disposal problems: presumably being formally or informally delegated to safely dispose of hazardous wastes increases the probability that one could have had a positive effect on disposal practices.

This standard is different, but more stringent on the whole than traditional corporate tort liability, yet it requires more than mere status as a corporate officer or director, which under CERCLA would be the equivalent of a strict liability standard. The test—whether the individual in a close corporation could have prevented or significantly abated the release of hazardous substances—allows the fact-finder to impose liability on a case-by-case basis, a result I favor in this area due to the seriousness of the potential liability. The test for liability of corporate individuals under CERCLA is thus heavily fact-specific, requiring an evaluation of the totality of the situation.

Moreover, consistent with CERCLA's goals, this standard will encourage increased responsibility with increased authority within a corporation. I take this to be a positive result, and thus a better standard than one which measures only the most direct knowledge or involvement in waste disposal activity, because it encourages responsible conduct instead of causing high level corporate individuals "not to see" and "to avoid getting involved with waste disposal at their facilities." Indeed where a close corporation produces or handles hazardous waste products, the message is quite the opposite. More specifically, I believe that both parts of this test boil down to corporate and societal responsibility—responsibility implicitly undertaken by the acquisition of increased power or authority within the corporation and responsibility explicitly undertaken by job description or agreement. Such a liability standard here will encourage increased responsibility as an individual's stake in the corporation increases.[5] I anticipate that responsibility undertaken will also be less frequently neglected. Thus, in sum, I find no genuine issue of material fact as to whether Thomas Solvent Company and Thomas Development, Inc. are "owners" or "operators" under § 107(a). While the facts may well be developed to show Richard Thomas as an owner or operator, I cannot say on

5. This standard will encourage increased responsibility for two reasons: First, as power grows, the ability to control decisions about waste disposal increases; and second, as one's stake in the corporation increases, the potential for benefiting from less expensive (and less careful) waste disposal practices increases as well.

the evidence before me that, as a matter of law, this is so. Nor can I say that, as a matter of law, Richard Thomas is not an owner or operator.

### 2. *Facility*

■ Plaintiffs must also show that the sites at issue are each a "facility" under section 107(a). CERCLA defines "facility" as, among other things:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.

42 U.S.C. § 9601(9). It is clear from this language that "facility" should be broadly interpreted. Courts have consistently done so. *Dedham Water Co. v. Cumberland Farms Dairy*, 889 F.2d 1146 (1st Cir.1989); *United States v. NEPACCO*, 810 F.2d 726, 743 (8th Cir.1986) ("facility" should be construed very broadly); *General Electric Co. v. Litton Business Systems, Inc.*, 715 F.Supp. 949 (W.D.Mo.1989); *The Southland Corp. v. Ashland Oil*, 696 F.Supp. 994 (D.N.J.1988); *U.S. v. Bliss*, Nos. 84–2086C(1), 87–1558C(1), 84–1148C(1), 84–2092C(1) (E.D.Mo. Sept. 27, 1988) (LEXIS, Gedfed library, Dist. file); *U.S. v. Mottolo*, 695 F.Supp. 615 (1988); *United States v. Ward*, 618 F.Supp. 884, 895 (E.D.N.C.1985); *New York v. General Electric Co.*, 592 F.Supp. 291, 295–97 (N.D.N.Y.1984); *United States v. Metate Asbestos Corp.*, 584 F.Supp. 1143, 1148 (D.Ariz.1984).

■ The Raymond Road, Annex, and Marshalling Yard sites are facilities within the meaning of CERCLA since they fall within *both* the description of Part (A) and Part (B) of the definition. They consist of buildings, structures, equipment, and so forth, *and* hazardous substances have been located there.

The Raymond Road facility includes a building, a warehouse, a dock used for storing drums, an area used for mixing chemicals, and 21 underground storage tanks ranging between 4,000 and 15,000 gallons in capacity. U.S. Complaint ¶ 3; Answer of Defendants Thomas Solvent Company and Richard E. Thomas, ¶ 3; Deposition of R. Thomas, at 15–16, and Ex. RT1.

The Annex was used for tank car unloading and has an unloading platform at which solvents were transferred to tank trucks. On the property there were, among other things, an above-ground tank and two underground tanks used to store mineral spirits. Deposition of R. Thomas, at 69–70, and Ex. RT2; Draft Remedial Investigation Report, Attachment to Quinn Affidavit, at 25.

Therefore, the Raymond Road, Annex and Marshalling Yard sites—all of which contain buildings, structures and equipment—are "facilities" within the definition provided in section 101(9)(A) of CERCLA. Moreover, as demonstrated *infra*, numerous hazardous substances, including PCE, TCE; 1, 1, 1 TCA; 1, 1 DCA; 1, 2 DCA; xylene and toluene have been found to exist in the soil and groundwater at the Raymond Road facility and the Annex facility. These locations are thus "sites or areas" at which "hazardous substances" have been "deposited, stored, disposed of, placed, or otherwise came to be located."

It is apparent, and defendants do not dispute, that the Raymond Road site and the Annex are facilities within the context of section 101(9) of CERCLA. The second factor for liability under section 107 is thus met.

### 3. *Releases or Threatened Releases of Hazardous Substances*

#### a. Releases/Threatened Releases

■ Proof of liability under CERCLA must also include evidence of a release or threatened release of hazardous substances at a site. CERCLA defines "release" to include any of the following: "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22). The term "environment" refers to "surface wa-

ter, groundwater, drinking water supply, land surface or subsurface strata, or ambient air." 42 U.S.C. § 9601(8).

In this case, the governments have provided extensive proofs as to the releases on the Raymond Road site and the Annex. Defendants provide no contrary evidence. The element of "hazardous substances" is likewise supported by plaintiffs without serious dispute on the part of defendants.

### (1) *Raymond Road site*

Storage tanks were used on the Raymond Road facility. By Richard Thomas's own testimony, the facility was used, in part, to store solvents. Deposition of R. Thomas, at 14. During the period of 1971 to 1984, there were twenty-one underground storage tanks in pace at the Raymond Road site. *Id.* at 22. Numerous substances, including TCE, PCE, and 1, 1, 1 TCA, were brought to the site and stored in these underground tanks. Deposition of Charkowski, at 328; Deposition of R. Thomas, at 18–23, 199, 271–275.

Spills, leaks, and disposal of hazardous substances at this site were not unusual. Quite the contrary, the governments demonstrate that spills, leaks, and disposal occurred *regularly* at the Raymond Road site. Many individuals who once worked at Thomas Solvent testified that the escape of hazardous substances occurred in many ways. Tank trucks were regularly emptied into underground tanks, and prior to 1980, after filling the underground tanks, the fill lines were simply drained onto the ground. Deposition of Clark, at 90. After 1980, the procedure changed slightly, but although the fill lines were then drained into buckets, in that process, wastes were spilled onto the ground. *Id.* at 92.

In another location at the Raymond Road site, Thomas Solvent stored percholorethylene (PCE) in an underground storage tank over which there was a shed. Deposition of Clark, at 85. On at least two occasions prior to 1984, PCE was spilled onto the ground when the underground tank was overfilled. *Id.* at 85, 116.

Similarly, there were significant leaks of chemicals from underground tanks. By order dated February 23, 1984, in Civil Action No. 84–72–CE, brought by the State in the Circuit Court of Calhoun County, Thomas Solvent was ordered to test for leaks in the underground storage tanks at the Raymond Road site. In response to that order, Thomas Solvent hired Horner Creative Products to conduct testing of the tanks. Deposition of Horner, at 18–20. Testing was done in March 1984, and the results indicated that prior to August 12, 1985, many of the underground tanks at the Raymond Road facility were leaking hazardous substances including 1, 1, 1 TCA, PCE, TCE, and hexane into the soil. For example, the tank containing 1, 1, 1 TCA leaked at the rate of .232 gallons per hour and the tank containing hexane at .556 gallons an hour.[6] *Id.* at 4 & Ex. 2.

Thomas Solvent's president, R. Thomas, was aware of, and testified about, leaks of hazardous substances at the site. Between 1963 and 1980, Thomas Solvent cleaned drums at the Raymond Road site. Deposition of R. Thomas, at 46–48. In that process, any remaining product was dumped onto the soils at the site. *Id.* at 46–48. Until approximately 1975, residues in hoses used to transfer product from one container to another were emptied onto the soils at the Raymond Road site. *Id.* at 51–52. As part of its regular practice of steam cleaning and methanol rinsing of tank trucks or trailers from 1970 to 1980, Thomas Solvent discharged hazardous substances from the compartments of the tanks onto the soil at the Raymond Road site. Deposition of Clark, at 66–67. In addition, from approximately 1963 to 1980, drums containing waste solvents stored at the Raymond Road site were often found to be leaking. Deposition of R. Thomas, at 89.

Given the foregoing practices, it is no surprise that hazardous substances have been detected in the soils and groundwater at the Raymond Road facility, not only in the EPA studies, *see* Affidavit of Quinn,

---

**6.** According to the governments, assuming constant leakage rates, .232 gallons per hour translates to over 5 gallons per day, over 150 gallons per month and over 2000 gallons per year—no small leak.

but by Thomas Solvent's own consultants. In 1982, James M. Sullivan, on behalf of Thomas Solvent engaged Keck Consulting Services, Inc. ("Keck") to assess the soil at Raymond Road for contamination. In a letter dated July 12, 1982, Keck reported to Sullivan that results of soil analysis showed the presence of numerous hazardous substances in the soil at the Raymond Road site. Robert Minning of Keck, designated by Thomas Solvent as its expert witness, has testified to these findings. Deposition of Minning, at 35 and Ex. 8.

### (2) The Annex Site

The Annex was used for unloading and storing solvents. On September 5, 1974, Grand Trunk entered into a new lease with Thomas Solvent, which described the purpose of the Annex as: "to maintain storage shed and for open storage." Deposition of R. Thomas, Ex. RT-6. According to plaintiffs, the operations at the Annex included unloading solvents from railroad tanker cars loading highway tanker trucks, filling fifty-five gallon drums with solvents, bulk storage of solvents in underground and above ground tanks and the storage of drums containing liquid industrial wastes. Releases of hazardous substances occurred at the Annex in connection with cleaning drums and tank trucks, flushing lines, spilling and leaking waste drums, overfilling of tanks and trucks and deliberate dumping.

There were several occasions upon which Thomas Solvent used the Annex as a dumping ground for hazardous substances. On more than one occasion, employees of Thomas Solvent took approximately thirty 55-gallon drums of waste solvents generated at the Raymond Road facility to the Annex to dump them. At the direction of Fred Thomas, the employees drove around the Annex and poured the solvents from the drums onto the soil. Deposition of Gunyan, at 50-52. The drums of solvents which were poured onto the ground at the Annex contained the line flush containing hazardous substances from the Raymond Road operation. *Id.*

Many of the releases of hazardous substances at the Annex related to waste solvents which Thomas Solvent handled as part of the reprocessing business. It is not disputed that Thomas Solvent stored waste solvents at the Annex for nearly two decades. Deposition of Gunyan, at 15. For years drums of waste were stored at the Annex on the dock next to the Blue Diamond Lumber Company. Deposition of Charkowski, at 58-59; Deposition of Gunyan, at 15; Deposition of Earl, at 7-8. These drums of waste were sometimes permitted to accumulate until there was no more space on the dock. *Id.* at 20, 48. Hundreds of waste drums were stored at the Annex and on at least one occasion there were over seven hundred drums on the dock. Deposition of Charkowski, at 91-92, 94-95, 100; Deposition of Clark, at 22. Thomas Solvent continued to store waste on the dock until the MDNR ordered that the practice be stopped in 1978. Deposition of Charkowski, at 92.

Wastes were often stored in drums which were old, in very poor repair, and could not be otherwise reused because of their condition. Deposition of Earl, at 61-62; Deposition of Gunyan, at 18; Deposition of Clark, at 21. At the Annex, these drums were stored outside where they were subjected to extreme weather conditions. The drums at the Annex often had loose or missing caps. Deposition of Clark, at 32. In hot weather, expansion sometimes caused the bottoms of drums to give way, permitting hazardous substances to discharge onto the ground. Drums in poor condition would ooze waste solvent which discharged into the surrounding area. Deposition of Charkowski, at 130, 137; Deposition of Gunyan, at 19-20. There were incidents at the Annex in which drums of waste fell over while being moved by Thomas employees, resulting in the discharge of solvents onto the dock. Deposition of Clark, at 32.

The loading dock was an earthen mound covered with asphalt. The surface was in poor condition because leaking drums of solvent had left marks, holes, and other discontinuities in the surface of the dock. Deposition of Charkowski, at 87. Since the asphalt was old and cracked, some of the materials that spilled on the dock would

ultimately wind up on the soil. Deposition of Charkowski, at 236; Deposition of Clark, at 11–12, 14–16.

The materials which leaked or spilled from these waste drums contained hazardous substances. Employees of Thomas Solvent testified that a majority of the drummed wastes handled by Thomas Solvent in Battle Creek were taken to the Annex for storage at some time. Deposition of Charkowski, at 148–150; Deposition of Gunyan, at 23. The chemicals in these drums would have included the various hazardous wastes handled by the company in its reprocessing and disposal operations generally. Thomas Solvent employees testified that they brought wastes including chlorinated solvents, perchloroethylene, xylene, toluene, degreasers and paint thinners to the Annex site. Deposition of Gunyan, at 119–21, 126–28; Deposition of Charkowski, at 139–41.

Many releases of hazardous substances at the Annex resulted from poor cleaning practices. Drums which were to be reused by Thomas Solvent were sometimes cleaned at the Annex. Deposition of Clark, at 11–12, 14–16. Until at least the 1970's, the usual cleaning practice was to put solvent in the drum, circulate it, and discharge the contents onto the ground at the Annex. Tanker trucks were cleaned by Thomas Solvent at the Annex in connection with the loading process. When trucks were brought to the Annex to be loaded with solvent from a railroad car, the trucks often contained solvent from previous loads. Prior to Thomas Solvent's loading the truck from the rail car, the trucks were emptied and cleaned at the Annex by flushing the tank compartments with solvent. Deposition of Gunyan, at 37–39. Until approximately 1980, the solvent flushed from the trucks was allowed to run onto the ground.

Railroad tank cars of hazardous substances including hexane, acetone, xylene and toluene were shipped to the Annex where they were unloaded into highway tank trucks and fifty-five gallon drums. The contents of the railroad tank cars were transferred by means of a hose attached to a stationary pump at the Annex. There were instances in which Thomas Solvent employees trans-loading from railroad cars to tanker trucks overfilled the tanker truck, causing spills of the solvent involved. On several occasions, releases of at least 10 to 15 gallons of solvents took place as railroad cars were being unloaded. Deposition of Charkowski, at 132. On more than one occasion, Thomas Solvent employees trans-loading from railroad cars to highway tanker trucks overfilled the tanker truck, causing spills of solvent onto the ground. Deposition of Charkowski, at 137, 213, 214. Toluene and xylene were transferred by pump directly from railroad cars into fifty-five gallon drums which were on the dock at the Annex. Deposition of Charkowski, at 302–303. During this process, some of the solvents spilled onto the dock or the soil in the surrounding area. Deposition of Gunyan, at 85–86. The governments argue that the foregoing practices help explain the quantitative findings both by EPA and by Keck that hazardous substances have existed in soils and groundwater at the Annex. Analyses of soil samples undertaken by both EPA and Thomas Solvent demonstrate that the soil at the Annex facility was unquestionably contaminated as the result of the releases described above. For example, in 1982, when Thomas Solvent retained Keck to test the soil at the Annex, Keck collected soil samples from the Annex facility. Deposition of Minning, at 14–17, 55. These samples were tested and showed contamination of trichloroethylene, tetrachloroethylene and chloroform contamination. *Id.* at 58–63 & Ex. 9. In a letter to James Sullivan, counsel for Thomas Solvent, Keck concluded that the Annex was a source of contamination of the Verona Well Field. Deposition of Minning, at 82–83, Ex. 14 (May 4, 1987). Minning testified that in his opinion volatile organic compounds had been released into soils at the Annex facility. Deposition of Minning, at 24–25 (Oct. 16, 1987).

Keck's analysis cooroborates the findings of EPA's remedial investigation. As a result of field work which included extensive soil sampling and installation of monitoring wells, Warzyn and Quinn conclude

that the soils at the Annex facility were contaminated with volatile organic compounds, principally PCE, TCE, toluene and ethylbenzene. Groundwater contamination at the Annex included, in part, PCE and TCE. Quinn Affidavit, ¶¶ 7–14.

(3) *Verona Well Field and Other Wells*

Plaintiffs have provided evidence to this Court to show that hazardous wastes released from the Raymond Road site and the annex have now migrated to the Verona Well Field and other, private wells nearby. As to the Raymond Road site, it is not disputed that groundwater from the Raymond Road facility flows into the Verona Well Field. This facility is a source of the volatile organic compounds ("VOCs") detected in the Well Field since 1981. Quinn Affidavit, at ¶¶ 14a–c. Defendants' expert has made identical findings. According to a hydrogeologist retained by Thomas Solvent, groundwater from below the Raymond Road facility flows into the Well Field and groundwater from below the facility is contaminated by VOCs which have now entered the Well Field. Deposition of Minning, at 27–28. During his deposition, Minning answered pointed questions on this subject:

Q. [Plaintiff's attorney] Sir, based upon your review of all of the available data in the area with respect not only to water quality but also to water elevation, have you formed any opinion as to whether or not volatile organic compounds released into the soils and groundwaters at the Thomas Solvent Raymond Road facility have migrated to the Battle Creek Verona Well Field?

A. [Minning] Yes.

Q. And what is that opinion?

A. That they have.

*Id.*

These experts have made similar conclusions about the Annex facility. Quinn has concluded that volatile organic compounds from the Annex have also contributed to the contamination found at the Well Field. Quinn Affidavit ¶¶ 14a, 14e.[7] Minning testified that groundwater from the Annex flows into the Well Field and is contaminated by VOCs which have made their way to the Well Field:

Q. [Plaintiff's attorney] I would like to ask you essentially the same question with respect to the Annex; that is, based upon your review of all the data, in your opinion have volatile organic compounds released into soils and groundwater at the Annex facility migrated to the Battle Creek Verona Well Field?

A. [Minning] Yes.

Deposition of Minning, at 28.

Thus the Court is satisfied that both the Raymond Road site and the Annex have contributed to the pollution at the Verona Well Field.[8] The Verona Well Field is not

---

7. The relevant parts of the affidavit read as follows:

14a. Groundwater flow occurs into the well field in a generally radial pattern. A groundwater divide was observed south [of] the well field between northerly flow towards the well field and flow to the southwest towards the Battle Creek River. The divide was shown to be south of ... the Annex.

14. The groundwater beneath the Annex is contaminated with high level of VOCs and the Annex is a substantial source of the groundwater VOCs present in the Verona Well Field.

8. One expert, retained by defendant Grand Trunk stated that the contribution from the Annex to the Verona Well Field was slightly different. Deposition of Swanson, at 174. Essentially, the conclusion is that groundwater from the Annex may merely be moving toward the Well Field. Plaintiffs argue—and the Court agrees—that based upon the evidence, the Well Field is at a minimum *threatened* by releases and migra-

tion of hazardous substances. *See* 42 U.S.C. § 9601(23) which reads in relevant part:

(23) The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken *in the event of the threat or release of hazardous substances into the environment,* such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

*See also* 2 U.S.C. § 9607(a)(1)(A), 9607(a)(1)(B) which read in part:

§ 9607. Liability

(a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date

the only area contaminated by these two sites. Volatile organic compounds were discovered about 1981 in the private wells in the Pennfield Township area south of the Well Field as well. Both the United States and the State of Michigan have incurred response costs in providing bottled water and temporary shower facilities, respectively, to residents with contaminated wells. Deposition of Tanaka, Ex. A. To the extent these costs are not inconsistent with the National Contingency Plan, they are recoverable against defendants upon a finding of liability under § 107. These parties do not dispute that the Raymond Road site is a source of contamination for these private wells. Deposition of Minning, at 28–30.

### b. Hazardous Substances

Pursuant to Section 107(a) of CERCLA, defendants are liable for those costs incurred in responding to a release or threat of release of a "hazardous substance." A "hazardous substance" is defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14). The definition includes numerous substances listed either specifically or generally under several other federal environmental protection statutes.[9] A list of specific hazardous substances for which liability may exist pursuant to CERCLA, have been consolidated and set forth at 40 C.F.R. § 302.4 (1986).[10]

"Hazardous substances" within the meaning of CERCLA, have been found at the Annex and Raymond Road facilities. The substances found in analyses of soil and groundwater performed for plaintiffs and defendants at the Verona Well Field, Annex, and Raymond Road facility include the following:

1. *Verona Well Field*
 1, 1 Dichloroethane (1, 1–DCA)
 1, 2 Dichloroethane (1, 2–DCA)
 1, 1, 1 Trichloroethane (1, 1, 1–TCA)
 Trichloroethylene (TCE)
 Cis–1, 2 Dichloroethene (1, 1–DCE)
 Trans–1, 2 Dichloroethene (1, 1–DCE)
 1, 1 Dichloroethene (1, 1–DCE)
 Perchloroethylene (Tetrachloroethylene or PCE)
 Methylene Chloride
 Chloroform
 Benzene
 Toluene
 Xylene
 Ethylbenzene
 Carbon Tetrachloride
 Ethylene Dibromide
 1, 2 Dibromomethane

2. *The Annex*
 Perchloroethylene
 Toluene
 Methylene Chloride
 Trichloroethylene
 2–Butanone
 Acetone
 Ortho-xylene
 Ethyl Benzene

3. *Raymond Road Facility*
 Perchloroethylene
 Toluene
 Acetone
 Ortho-xylene
 Ethylbenzene
 Trichloroethylene

---

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
 (1) the owner and operator of a vessel or a facility,
 (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
 (A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan.

**9.** These statutes include Section 3001 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6921; Sections 307(a) and 311(b)(2)(A) of the Clean Water Act, 33 U.S.C. §§ 1317(a) and 1321(b)(2)(A); Section 112 of the Clean Air Act, 42 U.S.C. § 7412; and Section 7 of the Toxic Substances Control Act, 15 U.S.C. § 2606.

**10.** In addition to listed hazardous substances, other substances are hazardous under CERCLA if they exhibit any of the hazardous characteristics identified under RCRA: EP toxicity, corrosivity, reactivity, and ignitability. *See* 42 U.S.C. § 9601(14)(C) and 40 C.F.R. § 261.20 *et seq.*

1, 1, 1–Trichloroethane

2–Butaone

Methylene Chloride

1, 2–Dichloroethylene

1, 2–Dichloroethane

Each of the substances enumerated above appears on the list of hazardous substance set forth at 40 C.F.R. & 302.3 and therefore constitutes a hazardous substance within the meaning of Section 101(14) of CERCLA. 42 U.S.C. § 9601(14). Consequently, the release of these substances at the Annex and Raymond Road facility constitutes a release of "hazardous substances" into the environment.

### 4. Response Cost Incurred

The final element necessary to find liability under § 107(a) of CERCLA is that the United States or the State must incur response costs due to the releases or threatened release of hazardous substances. Under § 101(25) of CERCLA, "response" includes, "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25). The terms "remove" or "removal" are described as "the cleanup or removal of released hazardous substances from the environment," and include the following actions that are necessary "to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment." *Id.* at § 9601(23). "Remove" or "removal" also include, *inter alia,* action taken under § 104(b) of CERCLA. Section 104(b) includes the following action, which is proper under § 101(23):

Such investigations, monitoring, surveys, testing, and other information gathering as he [the President] may deem necessary or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances, pollutants or, contaminants involved, and the extent of danger to the public health or welfare or to the environment. In addition, the President may undertake such planning, legal, fiscal, economic, engineering, ar-

chitectural, and other studies or investigations as he may deem necessary or appropriate to plan and direct response actions to recover the costs thereof, and to enforce the provisions of this Act. 42 U.S.C. § 9604(b).

In the matter before me, it is not disputed that the United States and the State of Michigan have taken response actions and incurred response costs at the Verona Well Field, the Raymond Road site, and the Annex. *See* Affidavit of Dikinis; Affidavit of Hackley. The Court is confident that response costs—since the time that these affidavits were obtained—continue to mount.

 Plaintiffs make it clear that they are not requesting that the Court determine the amount of recoverable response costs at this time. Case law confirms that determining this amount is unnecessary to a finding of liability under § 107(a) of CERCLA. *See* 42 U.S.C. § 9607(a); *United States v. Northernaire Plating Co.,* 670 F.Supp. at 746; *United States v. Stringfellow,* 661 F.Supp. 1053; *United States v. Wade,* 577 F.Supp. at 1335. Or, as the court in *Northernaire* wrote:

Next, plaintiff must prove that the release or threatened release caused the government to incur "response costs". . . . [T]he government has incurred such costs, and the defendants have presented no information which rebuts this part of the [evidence]. [Defendants] do, however, argue that the government has not shown that all costs are recoverable from the defendants. This issue is not relevant in the instant motion as the government seeks summary judgment only as to *the fact of* defendants' liability, and not as to the *amount of* defendants' liability.

670 F.Supp. at 747.

 Under Rule 56(c) of the Federal Rules of Civil Procedure, I can grant summary judgment as to liability without ruling on the exact amount of recoverable costs. Defendants, at a later time, may challenge certain response costs as being inconsistent with the National Contingency Plan. Section 113(g)(2) of CERCLA, as amended, which provides expressly that

"the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2).

Plaintiffs seek to recover costs as follows:

| | |
|---|---|
| Raymond Road Facility source control measures | Thomas Solvent, R. Thomas Thomas Development |
| Annex Facility source control measures | Thomas Solvent, Richard Thomas |
| Verona Well Field related response costs | Thomas Solvent, R. Thomas Thomas Development |

Liability for response costs—to be determined at a later date—exists then as a result of defendants Thomas Solvent Company's and Thomas Development, Inc.'s status as an owner and/or operator of a facility at which there was a release or threatened release of hazardous substances. I therefore grant plaintiffs' motion as to these defendants. Because there are material issues of fact as to Richard Thomas's liability, I deny plaintiffs' motion as to this individual defendant.

### 5. *Joint and Several Liability*

 Any liability established under § 107(a) of CERCLA is joint and several except where the harm is shown to be divisible. Indivisible harm is where multiple defendants contribute to a single harm to the environment, and it is impossible to determine defendants' relative contribution to the harm in a meaningful way. Under traditional and evolving principles of common law which CERCLA incorporates, where two or more defendants are responsible for an indivisible harm, each is subject to liability for the whole harm. *See, e.g.,* *United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988); *U.S. v. Miami Drum,* No. 85–0038–Civ. slip op. at 20, 1986 WL 15327 (S.D.Fla. Dec. 12, 1986); *U.S. v. Conservation Chemical Co.,* 589 F.Supp. 59, 63 (W.D.Mo.1984); *United States v. Wade,* 577 F.Supp. at 1338–39; *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802, 808 (S.D.Ohio 1983); *United States v. Ottati & Goss,* 630 F.Supp. 1361, 1395, 23 Env't Rep. Cas. 1705, 1734 (D.N.H.1985). Under this rule, the burden of demonstrating that the harm suffered by the government is in fact divisible and that, therefore, joint and several liability does not apply, rests with defendants. *See United States v. South Carolina Recycling and Disposal, Inc.,* 653 F.Supp. 984, 994, 20 Env't Rep.Cas. 1753, 1759 (D.S.C.1986) ("this court's initial focus should be on whether the harm at the . . . site was indivisible, an issue upon which defendants bear the burden of proof"); *United States v. Chem–Dyne Corp.,* 572 F.Supp. at 811 (the "burden of proof as to apportionment is upon each defendant"); *United States v. Ottati & Goss,* 630 F.Supp. at 1396, 23 Env't Rep. Cas. at 1734 ("[t]he burden of proof is upon the defendants to establish that a reasonable basis exists for apportioning the harm amongst them").

The court in *Miami Drum* stated:

The rule of law that emerges from *Chem–Dyne* and which has met with acceptance by other district courts, is that liability under Section 107(a) is joint and several *unless* a defendant or defendants can prove that the environmental injury is divisible *and* there is a reasonable basis for apportioning the harm.

*U.S. v. Miami Drum,* No. 85–0038–Civ, slip op. at 20 (S.D.Fla. Dec. 12, 1986). The question of whether the alleged harm is divisible is a question of fact. *United States v. Chem–Dyne,* 572 F.Supp. 802 (S.D.Ohio 1983). To sustain their burden of proof, defendants may not propose an arbitrary or theoretical basis for apportioning response costs. With a de facto division of harm, defendants liable under CERCLA are jointly and severally liable. "[A]rbitrary or theoretical means of cost apportionment . . . are matters appropriately considered in an action for contribution between responsible parties after plaintiff has been made whole." *United States v. South Carolina Recycling & Disposal,* 653 F.Supp. at 995, 20 Env't Rep.Cas. at 1759 (cost theoretically apportioned on the basis of volumetric contribution of waste does not render harm divisible); *United States v. Ottati & Goss,* 630 F.Supp. at 1396, 23 Env't Rep.Cas. at 1734 (number of drums contributed by each generator does not render harm divisible because proportional harm cannot be isolated with any degree of accuracy).

The legislative history of the 1986 SARA amendments to CERCLA, P.L. 99–499, con-

firms this reading of section 107(a). For example, the House Committee on Energy and Commerce reported as follows:

> No change has been made in the standard of liability that applies under CERCLA.... Where appropriate, liability under CERCLA is joint and several, as a matter of federal common law.... The Committee fully subscribes to the reasoning of the court in the seminal case of *United States v. Chem–Dyne Corporation*, 572 F.Supp. 802 (S.D.Ohio 1983), which established a uniform federal rule allowing for joint and several liability in appropriate CERCLA cases.

H.R.Rep. No. 253, Part 1, Superfund Amendments of 1985, 99th Cong., 1st Sess. 74 (Aug. 1, 1985), *reprinted in* 1986 U.S. Code Cong. & Ad.News 2835, 2856. Thus, a court will look to the question of divisibility to resolve the issue of joint and several liability. As the court in *Chem–Dyne Corp.* suggested, "if the harm is divisible and if there is a reasonable basis for apportionment of damages, each defendant is liable only for the portion of the harm he himself caused." 572 F.Supp. at 811. Where the harm is indivisible, then each defendant who is found to be liable is subject to liability for the entire harm.[11] *United States v. Northernaire Plating Co.*, 670 F.Supp. at 746.

 In the case before me, plaintiffs argue that defendants Thomas Solvent, R. Thomas, and Thomas Development are jointly and severally liable for the response costs at the Raymond Road facility. They also maintain that Thomas Solvent and R. Thomas are jointly and severally liable for costs associated with the Annex. Finally, plaintiffs ask the Court to find Thomas Solvent, R. Thomas, and Thomas Development jointly and severally liable as to the Well Field response costs too.

### a. Raymond Road/The Annex

I agree with plaintiffs that the harm at these facilities is indivisible. The burden is on defendants and they have shown no evidence demonstrating divisibility of harm. As the court in *Northernaire* decided, where the harm is indivisible, in spite of the defendants' various roles as landowner, corporate operator, and individual operator, the proper liability scheme is one where all defendants are jointly and severally liable. *Northernaire*, 670 F.Supp. at 748.

### b. Verona Well Field/Private Wells

Defendants have again presented no evidence to the Court demonstrating divisibility of the harm at the Verona Well Field. Here, of course, unlike the other two sites, the harm stems from different releases combining to contaminate the Well Field. Joint and several liability is still proper, however. The governments have submitted evidence—not disputed by these defendants—to show that the contaminated water at the Well Field contains a mixture of pollutants, including the volatile organic compounds which migrated to the Well Field from each of the facilities owned or operated by defendants.

According to plaintiffs, these contaminants have been identified as generally coming from two plumes: a southern plume from the Raymond Road facility and Annex and an eastern plume from the Marshalling Yard. Affidavit of Quinn ¶ 12(j).

---

11. Under CERCLA, actions for contribution are permitted among parties who have been jointly and severally liable. 42 U.S.C. § 9613(f)(1) reads as follows:

> (f) Contribution. (1) Contribution. Any person may seek contribution from any other person who is liable or potentially liable under section 107(a) during or following any civil action under section 106 or under section 107(a). Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person or bring an action for contribution in the absence of a civil action under section 106 or section 107.

Certainly where a court refuses to apportion liability because defendants have not demonstrated divisibility, it is pursuing the primary consideration here: making the government whole for response costs. Cost allocation is a matter "more appropriately considered in an action for contribution between responsible parties after plaintiff has been made whole." *United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988) (quoting *U.S. v. South Carolina Recycling Disposal*, 653 F.Supp. 984, 995 & n. 8 (D.S.C.1984)).

It is undisputed that the southern and eastern plumes have overlapped in the Well Field thereby mixing the hazardous constituents contained therein. Quinn's opinion on this is as follows:

> The Southern Plume and Eastern Plume have intersected in the Verona Well Field and have, to some extent overlapped each other so that the aquifer from which the Well Field pumps water has been contaminated by both plumes.

*See also* Deposition of Swanson, at 326 (Verona Well V–24 "lies at the junction of the eastern plume and the southern plumes.... [A]t some point that well is in the eastern plume and sometimes in the southern plume.") and Ex. 22 (showing maximum extent of combined plumes).

Moreover, when the pollutants enter the Well Field system they are blended in the main transmission line and cannot be distinguished as to which production well they derived from. Affidavit of Osborn ¶ 6. In order to clean up the Well Field, all of the pollutants must be removed from the Well Field regardless of their origination. *Id.* at ¶ 7. Put another way, the harm created by the contamination of the Verona Well Field was and is one of contaminants mixing and threatening to mix together in the water supply system, becoming commingled and producing a single harm—contamination of the public water supply.

The response actions undertaken by plaintiffs with respect to the Well Field have been directed at the overall problem created by the contamination. Plaintiffs first studied the problem to understand the groundwater flow scheme and the sources of contamination. Second, the migration of contaminants into the Well Field was controlled by pumping a series of existing production wells to stop the spread of contamination and by treating the contaminated pumped water with carbon beds and then with an air stripper. The purge system pumps water from both the southern and eastern plumes. Deposition of Swanson, at 316, 325–35, 344–47, 350–53. Other purge system alternatives were rejected because they would not intercept contaminants from both the south and east. Affidavit of Dikinis, ¶ 8. Similarly, the treatment system treats commingled water from both plumes. Third, plaintiffs, through the Initial Remedial Measure, have installed a new well to the north of the Well Field to replace the overall capacity lost from contamination in the south of the Well Field.

In sum, these actions represented an indivisible clean-up response to an indivisible harm. *Id.* at ¶¶ 5–8. Defendants Thomas Solvent Company and Thomas Development, Inc. have not met their burden of proving divisibility of harm. I therefore find these two defendants jointly and severally liable for an indivisible harm to the groundwater at the Verona Well Field and nearby private wells.

## PARTIAL SUMMARY JUDGMENT

In accordance with the opinion entered this date;

IT IS HEREBY ORDERED that plaintiffs' motion for partial summary judgment against defendants Thomas Solvent Company and Thomas Development, Inc. is GRANTED;

IT IS FURTHER ORDERED that defendants Thomas Solvent Company and Thomas Development, Inc. are therefore declared to be jointly and severally liable for response costs or damages associated with the Raymond Road Facility (Thomas Solvent Company; Thomas Development, Inc.); the Annex (Thomas Solvent Company); and the Verona Well Field (Thomas Solvent Company; Thomas Development, Inc.);

IT IS FURTHER ORDERED that plaintiffs' motion for partial summary judgment against defendant Richard Thomas is DENIED.