764 F.Supp. 565 (1991)
UNITED STATES of America, Plaintiff,
v.
MEXICO FEED AND SEED CO., et al., Defendants.
Nos. N 87-0030 C, N 89-0132 C.
United States District Court, E.D. Missouri, N.D.
May 16, 1991.
*566 *567 Joseph Moore, Asst. U.S. Atty., St. Louis, Mo., Robert Foster, Wendy E. Wagner, Beverlee Destein, Sam Blesi, Trial Attys., Env. Enforcement Sec., Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Gerhardt Braeckel, Asst. Reg. Counsel, U.S. E.P.A., Reg. VII, Kansas City, Kan., Richard M. Gold, Atty., Office of Enforcement, U.S. E.P.A., and Kalyn Cherie Free, Trial Atty., Environmental Enforcement Section, U.S. Dept. of Justice, Washington, D.C., for plaintiff.
Bradford A. Brett, Mexico, Mo., J. Kent Lowry, Hallie H. Gibbs, II, Jefferson City, Mo., and Theodore J. Williams, Jr., St. Louis, Mo., for defendants J. Pierce Waste Oil and M. Pierce.
David A. Oliver and John L. Whiteside, Columbia, Mo., for defendant Mexico Feed and Seed.
Arthur A. Benson, II, Jamie Kathryn Lansford, Kansas City, Mo., and Thomas P. Redington, Hannibal, Mo., for defendants Mexico Feed and Seed, J. Covington, M. Covington and J. Covington dba Mexico Feed.
Joseph D. Welch, Hannibal, Mo., and Kevin T. McClain and Thomas J. Immel, Springfield, Ill., for defendant Moreco.

MEMORANDUM OPINION
GUNN, District Judge.
This matter is before the Court for a decision on the merits after trial before this Court on July 23-24 and August 16-17, 1990. The parties have filed post-trial motions and proposed findings of fact and conclusions of law. Based on the evidence and testimony presented at trial, and the post-trial memoranda submitted, the Court now adopts this memorandum opinion as its findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52.
Prior to its decision, however, the Court will rule on a few preliminary procedural issues raised by the parties. First, the summary judgment motions filed by plaintiff and defendant Moreco Energy, Inc. (Moreco) will be denied in an accompanying order. Second, in post-trial briefing the parties have raised two issues concerning the procedural posture of this action against Moreco. In addressing those issues, the Court finds it helpful to briefly outline some procedural history of this action.
The plaintiff originally filed action N87-30 against defendants Mexico Feed and Seed, Inc. (Mexico), James and Mary Covington, Jack Pierce, Pierce Waste Oil Service, Inc. (PWOS), Martin Pierce, Helen Pierce and Mary Lynn Giacomini[1] for recovery of response costs incurred in cleaning up a hazardous waste site pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq. The plaintiff later filed a separate action, N89-132, against Motor Oils Refining Technology Company (Motor Oils) and Mid-Mo Electric Company (Mid-Mo) based on the same *568 series of events. By order dated February 23, 1990, the two cases were consolidated.
Plaintiff's action against Motor Oils was based on a theory of successor liability, as Motor Oils had allegedly purchased the assets of PWOS. However, on May 9, 1990, plaintiff moved to substitute Moreco for Motor Oils after discovering that Moreco was the actual purchaser of the PWOS assets. (Motor Oils was identified to the plaintiff as a d/b/a of Moreco during a deposition of Moreco's president, Stuart Rubin, on April 18, 1990.) Counsel representing Motor Oils was the same as counsel representing Moreco, and Moreco has never represented that it was unaware of the action against Motor Oils.
By order dated June 1, 1990, this Court granted plaintiff's motion to substitute and vacated the previously-rescheduled trial date of June 18, 1990. Trial was again rescheduled for July 23, 1990. Plaintiff then filed a first amended complaint and obtained service on defendant Moreco. Defendant Moreco filed a motion to dismiss on July 13, 1990.
On the day of trial, July 23, 1990, neither Moreco nor its counsel appeared. This Court had contacted the office of Moreco's trial counsel during the previous week to notify them that the trial would be conducted on the scheduled date. Defendant Moreco's counsel did not file a motion for continuance and did not appear on the day of trial to request a continuance. Since the other parties were present and ready to proceed, the Court denied Moreco's motion to dismiss and announced its intention to proceed with the trial. However, in an effort to accommodate all parties' interests, the Court severed the plaintiff's action against defendant Moreco and rescheduled trial on that issue for August 16, 1990. The Court then proceeded with the plaintiff's case against the alleged primarily-liable party, PWOS. On August 16-17, the plaintiff presented its case of successor liability against defendant Moreco.
Moreco now claims, however, that because it was not present for the July trial, and because plaintiff did not re-present its evidence of original liability against PWOS in the August trial, that the evidence from those trials cannot be used by plaintiff to establish Moreco's liability as a successor. The Court disagrees.
The parties have briefed this issue and have raised the theory of collateral estoppel. While technically collateral estoppel does not apply here, as there was no prior adjudication, some of the principles used by the courts in applying collateral estoppel are helpful in resolving the present issue. After considering several of those principles set forth in Parklane Hosiery Co. v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Court finds that plaintiff was not required to retry its original liability case in the second, successor liability trial.
First, Moreco possessed a full and fair opportunity to be heard and to cross-examine witnesses in the original liability trial against PWOS. The fact that Moreco did not do so was of its own doing. In addition, the Court finds that although Moreco was absent at the first trial, its interests were well represented by the defendant PWOS, which had strong motivation to defend the action against it. There were no procedural opportunities available at the first trial which were not available in the second, and the plaintiff did not gain an unfair advantage by trying the first without Moreco. In fact, if any party was disadvantaged, it was the plaintiff, which, because of Moreco's recalcitrance, was required to divide up a case which had been previously consolidated and expend the extra time and money required for two separate trials. Therefore, the Court denies any claims by Moreco with respect to this issue.
The other procedural item raised by Moreco deals with the plaintiff's alleged failure to comply with the Court's local rules by submitting its exhibit and witness lists to Moreco the day before trial. Local rules require the submission of those documents at least ten days prior to trial. Counsel for plaintiff states that she operated in a good faith belief that this Court waived the local rule requirement after the July trial. However, any discussion or ruling *569 concerning this occurred off the record. The Court finds that even without waiver of the local rules, the tardy submission by the plaintiff of such documents was not harmful for several reasons.
First, the documents submitted were revised lists, and counsel for Moreco had access to the original lists filed with respect to plaintiff's case against his prior client, Motor Oils. Moreco has not demonstrated how it was prejudiced by this late submission. Furthermore, Moreco did not, at any time prior to, during, or after the August trial, submit to the plaintiff an exhibit or witness list and is therefore out of position to raise complaint.
Having now resolved the numerous procedural issues, the Court will render its findings.

FINDINGS OF FACT
The "site" at issue in this case is a 40' × 40' subparcel of land, including four tanks placed thereon, located in Audrain County, Missouri. The site is located on real property owned by defendant James Covington, president of defendant Mexico Feed and Seed Company (Mexico). Mexico comprises about three of fifty-three acres of land owned by Covington. The site is situated on the three acres occupied by Mexico.
In the mid-1960s, defendant Jack Pierce entered into an oral lease agreement with defendant Covington for the placement by PWOS of waste oil tanks on the site. Pierce was president and a majority shareholder of PWOS. Pursuant to the oral lease, Pierce paid Covington rent of $150 per year, which was increased to $200 per year around 1970-71. The last rental payment made by Pierce was for the time period of April 1973 to May 1975. Prior to the placement of the tanks on the site, no oil was present in that vicinity. During the years 1967 to 1984, from two to four oil tanks were located on the site.
PWOS actively used the tanks located on the site for the placement, storage and removal of oil from at least 1967 through 1976. Employees of PWOS regularly picked up waste oil from customers, stored the oil in the tanks on the Mexico site, and later transported the stored oil in tanker trucks to the PWOS facility located in Springfield, Illinois. At times, while loading or unloading the oil, oil would spill from the hoses or tank faucets. Drivers daily drained the oil tanks of water and at times threw sludge on the ground when cleaning screens and hoses.
In 1976, Covington made a citizen's arrest of some strangers who were taking oil out of the PWOS tanks. PWOS later filed a criminal complaint against those individuals. That was the only incident in which strangers were seen around the tanks during the relevant time period. After 1976, PWOS did not use the tanks for storage, and no other company or individual ever used the tanks. Some waste oil was left in the tanks and no attempts were made to clean the tanks of remaining sludge. Holes in the top of the tanks permitted the accumulation of rainwater and snow in the tanks. PWOS did send an employee to check out a leak of one of the tanks in the late 1970s  early 1980s. The employee pumped fluids out of at least one of the tanks at that time.
During 1967-1976, PWOS employees hauled various types of oils, including transformer oils. Many transformers contained PCBs (polycholorinated biphenyls) during that time. One of the customers of PWOS was Mid-Mo, a rebuilder of transformers. A PWOS driver, Eugene Affolter, pumped waste oil directly out of transformers at Mid-Mo and hauled such oil to the Mexico site. PCBs were found at the Mid-Mo location in 1985, and Mid-Mo has been designated as a PCB Superfund site.
During that period of time, PWOS drivers also hauled oil from Findett, a company which reclaimed fluids from Monsanto Company. Until about 1979, Monsanto was the major manufacturer of PCBs in the United States.
PWOS drivers also regularly collected oil from A.B. Chance, A.P. Green, and Kaiser Refractories, all of which have been found to have PCBs on site. PWOS drivers did not test oil from 1967-1975 for the presence *570 of PCBs and never rejected oil from a customer due to its contents.
Mexico never used the PWOS tanks for its own purposes and never agreed to accept ownership of the tanks in lieu of rental payments. The tanks were never listed as an asset of Mexico Feed and Seed or of James and Mary Covington.
In June and July of 1984, a representative of the United States Environmental Protection Agency, David Ramsey, inspected the Mexico site for the presence of PCBs. PCBs are listed as "hazardous substances" at 40 C.F.R., part 761. At the time of the inspection, waste oil sludge was present in all four of the tanks, and water was dripping from the valve of one of the tanks. Waste oil sludge can contain PCBs. The inspection revealed that two of the tanks contained high concentrations of PCBs (80 percent and 74 percent) and that the other two tanks contained traces of PCBs.
Conrad Nottingham, a chemist with the EPA who conducted tests on the samples taken from the site, testified that an area becomes a cleanup site when the soil contains 50 parts per million PCBs. Samples of soil from the tank area revealed 330 parts per million of PCBs. Nottingham also concluded that the Mexico site was contaminated and that the contamination area radiated out from the tank area for about 100 feet. The incorporation of the PCBs into the environment over a period of time (weathering) had occurred, indicating that the initial point of contamination occurred as much as twenty years before.
The United States "cleaned up" the site and incurred response costs of over $1,024,321.79.
In July 1983, Jack Pierce sold the assets of PWOS to Moreco, ceased operations and dissolved the PWOS corporation. The shareholders of PWOS (Jack and Martin Pierce) were paid a partial price, with the remainder to be paid out over a ten-year period. Jack and Martin Pierce have never been paid in full by Moreco.
According to the asset-purchase agreement, most PWOS assets acquired by Moreco were specified but not limited to those specifically listed. However, the list of excluded assets expressly stated those which were not intended to be purchased. While the tanks located on the Mexico site were not specified in the acquired list, they also were not expressly excluded from the agreement. Included in the assets acquired were the PWOS name, good will, customer lists and facilities.
After the purchase, Moreco continued to run the waste oil business out of the PWOS Springfield, Illinois site and, pursuant to the asset-purchase agreement, hired Pierce's son, Martin Pierce, to manage the Springfield facility. The Springfield operation continued to be referred to as the PWOS Division, or Pierce Division, until 1986. Moreco maintained the same employees, same customers, same routes, same phone number and address, same trucks, receipts and other aspects of the business at least until 1986. Moreco did not retrain the PWOS employees. PWOS continued to be listed as a named insured on Moreco's insurance policies after the date of purchase, and as late as 1987, Moreco was calling itself PWOS in matters relating to the Illinois EPA.
Under the terms of the asset-purchase agreement, "assets and business of Seller that are ... sold, ... shall, when transferred, allow Buyer to operate the business of Seller in the same manner as previously operated." Furthermore, Moreco made no significant changes in the waste-hauling business. As late as 1986, the trucks maintained the PWOS name and customers such as Panhandle Eastern, ITT Blackburn, American Can, and Mallinckrodt were unaware that PWOS was no longer hauling their waste.
The officers of Moreco and directors were not the same as PWOS. The asset-purchase agreement did, however, provide that Moreco was to use its best efforts to have Martin Pierce elected to the Board of Directors, and he did become a vice president, and member of the board in 1988.

CONCLUSIONS OF LAW
Based on the above factual findings, the Court renders the following conclusions of law:

*571 PRIMARY LIABILITY
CERCLA was enacted by Congress in 1980 as a response to hazardous waste problems. According to 42 U.S.C. § 9607(a), the United States is authorized to sue to recover for damage to natural resources and for "all costs of removal or remedial action."
In order to establish liability, the United States must show the following: (1) that a site is a "facility"; (2) that a release or a threatened release of a hazardous substance from the site has occurred or is occurring; (3) that the release has caused the United States to incur response costs; and (4) that the defendants fall within at least one of the classes of liable persons as found in § 9607(a)(1). United States v. Bliss, 667 F.Supp. 1298, 1304 (E.D.Mo. 1987).
Applying the above factors to this case, the Court finds that the Mexico site with the tanks situated thereon is a facility within the meaning of CERCLA. In addition, none of the parties dispute that a release of hazardous substances (PCBs) did occur which caused the incurrence by the government of costs in cleaning up the site. The final factor to consider is whether PWOS and Jack Pierce are liable parties under the Act.
According to 42 U.S.C. § 9607(a)(2), a liable person is "any person who at the time of the disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." The Court finds that at the time of the disposal of the PCBs at the Mexico site (mid 1960s-early 1980s, at the latest), that PWOS owned or operated that facility. The evidence was clear that PWOS was owner of the tanks, maintained control over them and was the sole user of the tanks during that time.
For the same reasons, the Court finds that Jack Pierce is a liable person under § 9607(a)(2). As defined by the Act, the term "person" includes both individuals and corporations and does not exclude corporate officers or employees. 42 U.S.C. § 9601(21). In United States v. Northeastern Pharmaceutical & Chemical Co., 810 F.2d 726, 743 (8th Cir.1986), the court held:
[T]o impose liability upon only the corporation and not the individual corporate officers and employees who are responsible for making corporate decisions about the handling and disposal of hazardous substances would open an enormous, and clearly unintended, loophole in the statutory scheme.
In addition, in United States v. Conservation Chemical, 628 F.Supp. 391, 418 (W.D. Mo.1985), the court held:
From the language of the statute a person who owns an interest in a facility and is actively participating in its management can be held liable for the disposal of hazardous waste.
As president of PWOS during the relevant time period, Pierce was in charge of and directly responsible for all of the PWOS operations and, hence, possessed ultimate authority to control the disposal of the hazardous substances. Therefore, as owner and operator at the time of the disposal of the hazardous waste at the Mexico site, Jack Pierce is liable under CERCLA.
This Court's conclusion is not altered by the fact that PWOS was dissolved as a corporation on February 29, 1984. When determining the liability of a dissolved corporation under CERCLA, the courts have utilized two different approaches. Some decisions look to the corporate business capacity statute under which the corporation was organized, while others find that the relevant statutes are preempted by the overall purpose of CERCLA to hold the responsible parties accountable. See Levin Metals Corp. v. Parr-Richmond Terminal Co., 817 F.2d 1448 (9th Cir.1987); Columbia River Service Corp. v. Gilman, et ux., et al., 751 F.Supp. 1448 (W.D.Wash.1990); United States v. Sharon Steel Corp., 681 F.Supp. 1492 (D.Utah 1987); and United States v. Distler, 741 F.Supp. 643 (W.D.Ky. 1990). In this case, PWOS and Jack Pierce are liable under either approach.
With respect to the first approach, Fed. R.Civ.P. 17(b) provides that the capacity of a corporation to sue or be sued is determined by the law under which it is organized. *572 In this case, PWOS was undeniably organized under Delaware law. And Delaware law provides that a dissolving corporation is continued, and thus liable, for three years from the date of expiration or dissolution, and if sued during that three-year period, is continued beyond that period until judgments, orders or decrees are fully executed. See 8 Del.Code § 278.[2] In this case, PWOS was dissolved as a corporation on February 29, 1984, and plaintiff filed this action on February 26, 1987, within the three-year period. Therefore, PWOS remains liable. This approach is followed in Levin Metals, supra, and Columbia River, supra.
PWOS would also be liable under Sharon Steel, supra, and Distler, supra. According to that circumstance, if CERCLA imposes liability but the responsible corporation lacks the capacity to be sued under the state law, then the two laws conflict and CERCLA preempts the state statute. Distler holds to this theory but found no precedent for holding the defendant corporation liable when it had been dissolved nine years prior to the suit being filed. Distler can be readily distinguished here, however, since suit was filed less than three years after PWOS dissolved and prior to a complete winding down and distribution of the PWOS assets. Therefore, even under preemption, PWOS is liable under CERCLA.

SUCCESSOR LIABILITY
With respect to the issue of successor liability, the traditional rule is that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the transferor, with four exceptions: (1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger[3]; (3) where the transferee corporation is a mere continuation of the transferor; or (4) where the transaction was fraudulent or lacking in good faith. United States v. Distler, 741 F.Supp. 637, 640 (W.D.Ky.1990). The Court finds that Moreco is liable as a successor corporation of PWOS under a broadened version of the "mere continuation" exception known as the "substantial continuity" or "continuity of enterprise" exception. See Distler, supra, 741 F.Supp. at 641.
In determining whether to impose successor liability pursuant to this exception, courts weigh a number of factors, including, whether the successor:
(1) retains the same employees; (2) retains the same supervisory personnel; (3) retains the same production facilities in the same location; (4) continues producing the same products; (5) retains the same name; (6) maintains continuity of assets and general business operations; and (7) whether the successor holds itself *573 out to the public as the continuation of the previous corporation.
Distler, supra, 741 F.Supp. at 642-43. Applying these factors to the present case, the Court finds that Moreco is liable as a successor to PWOS. The company retained the same employees and management, operated out of the same physical facilities and continued the same waste-hauling business, held itself out to the public as the same company and retained virtually all of the operating assets. The fact that Moreco did not retain the same officers or board members is not fatal, as noted by Distler, as long as these other factors are present.
In conclusion, defendants PWOS, Jack Pierce, and Moreco, are jointly and severally liable to the plaintiff for the costs incurred in the cleanup, $1,024,321.79, plus prejudgment interest. See U.S. v. Conservation Chemical, 619 F.Supp. 162, 186 (W.D.Mo.1985). In addition, pursuant to 42 U.S.C. § 9613(f), defendants PWOS, Jack Pierce, Moreco and Mid-Mo Electric Company[4] are liable to Mexico on its cross-claim for contribution. In § (f)(3)(B), the Act provides that a person who has resolved its liability to the government may seek contribution from any person not party to a settlement. In this case, Mexico seeks to recover the $20,000 it paid in settlement of its claims, plus attorney's fees "in excess of" $53,000. Absent further guidance from the law or the parties, the Court finds the above-mentioned defendants are also jointly and severally liable to Mexico on its cross-claim in the amount of $36,500, which represents one-half of the amount sought by Mexico.
The Court finds no evidence to support the cross-claim of defendant PWOS against any of the defendants and no evidence to support the cross-claim of defendant Mexico against defendants Martin Pierce, Helen Pierce, and Mary Lynn Giacomini.
An appropriate judgment shall accompany this memorandum opinion.

JUDGMENT
In accordance with the memorandum opinion filed this date and incorporated herein,
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that plaintiff United States shall have judgment jointly and severally against defendants Pierce Waste Oil Service, Inc., Jack Pierce, and Moreco Energy, Inc. in the amount of $1,024,321.79 plus prejudgment interest.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendant Mexico Feed & Seed Company shall have judgment jointly and severally against defendants Pierce Waste Oil Service, Inc., Jack Pierce, and Moreco Energy, Inc. on its cross-claim in the amount of $36,500.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendants Mexico Feed & Seed, James Covington d/b/a Mexico Feed & Seed, James F. Covington, Mary J. Covington, and Moreco Energy, Inc. shall have judgment against defendants Pierce Waste Oil Service, Inc. and Jack Pierce on their cross-claim, and such cross-claim is dismissed with prejudice.
IT IS FURTHER ORDERED that the following motions are denied: the summary judgment motions filed by plaintiff and defendant Moreco, the motion to dismiss of defendants Pierce Waste Oil Service, Inc. and Jack L. Pierce, and the motion to strike of defendants PWOS, Jack L. Pierce and Martin J. Pierce.
IT IS FURTHER ORDERED that the motion to dismiss filed by defendant Martin J. Pierce is granted, and plaintiff's complaint and defendant Mexico's cross-claim against him are dismissed.
IT IS FURTHER ORDERED that plaintiff's complaint and the cross-claim of defendant Mexico Feed & Seed Company against defendants Helen Pierce and Mary Lynn Giacomini are dismissed with prejudice.
*574 IT IS FURTHER ORDERED that each party shall bear its own costs.
NOTES
[1] All claims against defendants Martin Pierce, Helen Pierce, and Mary Lynn Giacomini were abandoned by the plaintiff prior to trial. Default was entered against defendant Mid-Mo on September 24, 1990. Prior to trial, defendants James and Mary Covington and Mexico Feed & Seed settled their claims with plaintiff. Therefore, this opinion is limited to plaintiff's claims against defendants Pierce Waste Oil Systems, Inc., Jack Pierce, and Moreco, Inc., and the cross-claims of Mexico and PWOS.
[2] The statute provides in full as follows:

All corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of 3 years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct, bodies corporate for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities and to distribute to their stockholders any remaining assets, but not for the purpose of continuing the business for which the corporation was organized. With respect to any action, suit or proceeding begun by or against the corporation either prior to or within 3 years after the date of its expiration or dissolution, the action shall not abate by reason of the dissolution of the corporation; the corporation shall, solely for the purpose of such action, suit or proceeding, be continued as a body corporate beyond the 3-year period and until any judgments, orders or decrees therein shall be fully executed, without the necessity for any special direction to that effect by the Court of Chancery.
[3] Plaintiff contended at trial and in its post-trial brief that Moreco is liable pursuant to the consolidation or "de facto" merger theory. In support, plaintiff relied on the case of United States v. Vertac Chemical Corp., 671 F.Supp. 595 (E.D. Ark.1987), which indeed stands for that proposition. However, neither plaintiff nor any of the defendants noted to this Court that the Vertac case was vacated by the United States Court of Appeals for the Eighth Circuit. See United States v. Vertac Chemical Corp., 855 F.2d 856 (1988). No other cases cited by the plaintiff for the merger proposition support its theory.
[4] Default was entered against Mid-Mo on September 24, 1990, and default judgment is entered against it by this Court on this date.