ANALYTICAL MEASUREMENTS, INC.; (a NJ corporation held in trust by Ella May Paully and Theresa Scarinzi), and Ella May Paully (individually), Plaintiffs,

v.

The KEUFFEL & ESSER COMPANY; the Azon Corporation; Selective Insurance Company; the Orion Group; the Aetna Casualty & Surety Company; and John Does I through X, Defendants.

Civ. No. 89–2512.

United States District Court, D. New Jersey.

Feb. 9, 1993.

George J. Grochala, Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart, Roseland, NJ, for plaintiffs.

Philip R. Sellinger and Douglas R. Weider, Sills Cummis Zuckerman Radin Tischman Epstein & Gross, Newark, NJ, for defendant Alfred E. Busch.

John H. Klock and Craig E. Johnson, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for defendants Azon Corp. and Keuffel & Esser.

## OPINION

DEBEVOISE, District Judge.

Defendant, Alfred E. Busch, moves for summary judgment pursuant to Fed.R.Civ.P. 56 against plaintiffs', Analytical Measurements, Inc. ("Analytical") and Ella May Paully's, claims and co-defendants', Azon Corporation ("Azon"), Keuffel & Esser Company ("K & E"), William G. Keller and Robert K. Keller's, cross-claims for contribution to costs associated with cleaning up hazardous waste at a property site located in Chatham, New Jersey.

For the following reasons, defendant's motion is denied in part and granted in part.

### SUMMARY OF FACTS AND PROCEDURAL HISTORY

Plaintiff Ella May Paully is the owner of property located at 31 Willow Street in Chatham, New Jersey (the "Property"). Analytical is a New Jersey corporation that has rented the Property since 1967 and maintains its principal place of business in New Jersey. Analytical is owned and operated by a trust with Ella May Paully and Theresa Scarinzi serving as trustees.

Plaintiff Paully's deceased husband, Frank Paully, purchased the Property from K & E in 1967. K & E is a California corporation with its principal place of business in New Jersey. Between approximately 1947 and 1967, K & E owned the Property and operated a photosensitive paper coating factory which was commonly known as the "Redon" plant (hereinafter referred to as "Redon Plant" or "Chatham Facility"). Among other things, diazo dye was used by K & E to coat rolls of paper at the Property during this period. Such coated paper was commonly used as blueprint paper by architects, engineers and other draftsmen.

K & E used many different formulations of diazo dye over the years. Various chemicals, including zinc and zinc chloride, were constituents of some of those formulas.

This suit arose from Plaintiff Paully's thwarted attempt to sell the Property which Analytical leases. On March 24, 1988, Paully entered into a contract to sell the Property. New Jersey State law requires that before selling an industrial site, the State has to certify that the land is not contaminated. *See* Environmental Cleanup Responsibility Act ("ECRA") N.J.Stat.Ann. § 13:1K–6 *et seq.* The State found that the Property and the adjoining property were contaminated by hazardous substances and wastes such as asbestos, petroleum hydrocarbons and diazo dye waste, the chemical used by K & E for coating its paper products. The State held both Paully and Analytical jointly and severally strictly liable for the cost of cleaning the Property.

K & E was a closely-held family run company from the turn of the century to 1965. During a major portion of those years, the Keuffel family owned all the company stock. Busch was a member of the Keuffel family, but Busch was not a common stockholder in K & E until approximately 1971. Prior to 1971, Busch owned preferred shares that he inherited in the 1950's. Busch was an employee of K & E from 1937 until the company was sold in 1982.

In or about 1955, Busch became Treasurer of K & E. Busch subsequently received a promotion to Vice–President of Finance. Around 1963, Busch became President and Chairman of the Board of K & E. Busch presided over all the Board of Directors' meetings as Chairman of the Board until his retirement from the company.

In the 1950's, the Passaic Valley Water Commission ("PVWC") became concerned that K & E's chemical wastes were reaching the Passaic River nearby. As a result of the PVWC complaint, in the 1950's, K & E undertook a study to determine alternative chemical waste disposal methods. (*See* Borough of Chatham Planning Board Meeting dated 5/20/64 attached as Ex. G to Oct. 8, 1992 Cert. of George J. Grochala.) J. Russell Juten, who became an attorney with K & E in 1940 (November 5, 1992 J. Russell Juten Dep. 8:7–8 attached to November 23,

1992 Certification of Craig E. Johnson as well as to Pls.Let.Br. dated Nov. 20, 1992) and was Vice–President and General Counsel when he retired in 1972 (*Id.* at 9:16–20), believes that the chemical waste lagoons were probably built as a result of that study. Mr. Juten has no personal recollection of the lagoons being put in, only that they existed. (*Id.* at 117:10–16.) Mr. Juten believes though that Defendants William Keller and Alfred Busch participated in the decision to create the lagoons. (*Id.* at 65:1–11.) But Mr. Juten has no personal recollection of Defendant Busch making any decision regarding the disposal of waste at the Chatham Facility, (*Id.* 117:25–118:1–13; *but see* 114:20–24) or of Defendant Busch having any personal involvement in the studies performed. (*Id.* 118:22–25.)

Around 1963, Busch became President and Chairman of the Board of K & E. During his tenure as President of K & E, Busch required that all Vice–Presidents of the various divisions of K & E report directly to him in an advisory capacity. Although Defendant William Keller as Vice President of Manufacturing had direct responsibility for the operations of the Chatham Facility and reported directly to Busch, Mr. Keller testified that he did not recall Busch having responsibility for manufacturing. (W. Keller Dep. at 65:5–7.) Mr. Keller also did not recall ever having an occasion to meet with Busch at the Chatham Facility or to discuss the Chatham Facility with Busch. (*Id.* at 65:8–12.) Mr. Keller's recollection is corroborated by Mr. Juten's acknowledgment that Busch had no direct operational responsibility for the Chatham Facility and that waste disposal decisions were the responsibility of the individual facility. (Juten Dep. at 124:23 to 125:14; 160:1–13.) Mr. Juten remembers Defendant Busch as being in charge of manufacturing in some of the chemical plants as distinguished from coating plants. (*Id.* at 81:8–11.) The Chatham Facility was considered a coating plant.

Mr. Juten testified that when he came to the company there were only three officers who acted as heads of the various functions. (*Id.* at 115:7–8.) According to Mr. Juten, these officers met regularly, and any matter of importance was discussed among them. (*Id.* at 115:9–11.) Mr. Juten, without elaborating, suggested that more than discussions took place such that everybody was involved in the decision to move the Chatham Facility. (*Id.* at 115:20–24.)

An important corporate matter in 1964 was the possible expansion of the Chatham plant. (Juten Dep. 49:12–15.) Mr. Juten testified that William Keller was involved in discussions regarding what to do with the lagoons during the possible expansion. (*Id.* at 60:21–61:10.) Because of the great importance of the expansion, Mr. Juten believes that Busch was also probably involved in these discussions. (*Id.* at 61:18–25; 62:1; 155:14–25.) Mr. Juten admits that he has no personal recollection of Busch having any involvement in that decision. (*Id.* at 117:21–118:1–13.) During this time, Mr. Juten represented K & E at a Chatham Planning Board meeting held on May 20, 1964 in K & E's application to have the property adjoining the Chatham Facility rezoned so that K & E could expand its operations there. (Borough of Chatham Planning Board Meeting dated 5/20/64 attached as Ex. G to Oct. 8, 1992 Cert. of George J. Grochala.) The Board made numerous inquiries about the nature of the lagoons and the waste product deposed of therein. (*Id.*)

In approximately 1964, K & E hired an outside engineering firm to analyze its Chatham chemical wastes and convince the local sewage authority that the wastes would not affect the bacteria used to treat waste water. (Juten Dep. 74:18–76:11.) The local sewage authority would not accept K & E's chemical waste due to the potential harm to the bacteria. (*Id.* 74:18–75:23.)

From the 1950's to 1978, the Board of Directors' meetings were held at least monthly. (Juten Dep. at 110:21–25–111:3.) William Keller and Alfred Busch attended those meetings. (*Id.* at 111:12–14; 111:18–20.) Chemical waste disposal at the anticipated Rockaway plant was discussed at a board meeting. (*Id.* at 119:3–16.) Mr. Juten explained that in his opinion Busch was a

"detail" oriented man who received regular status reports concerning all product facilities. (*Id.* at 141:5–22.)

Busch's name appears on the circulation list of a technical memorandum authored by Peter Ermanis, a Chatham diazo chemist throughout the 1950's and 1960's. The document discusses a diazo coating process developed at Chatham and known as "Kecotherm." Mr. Juten noted that the memo was directed solely to people possessing technical backgrounds. Mr. Juten could not explain why this memorandum was copied to Busch (92:11–83:3), but Mr. Juten suspected that Busch probably got a copy of this memo because he was closely involved in developing products, including diazo products such as Kecotherm. (*Juten* 85:12–86:21; 120:12–24; 123:5–19.)

Walter Rosenberg, who worked in the Chatham Facility from 1952 to 1962 and was the plant manager when he departed, testified that he had no knowledge of Busch having any responsibility for waste disposal process or ever having been consulted regarding the waste disposal practices at the Chatham Facility. (Walter Rosenberg Dep. at 141:6–21 attached as Ex. C to Weider Supp.Cert.) According to Mr. Rosenberg, Busch's only trips to the facility were an occasional visit with salesmen. (*Id.* at 141:2 to 142:13.) Likewise, both William Manko and Michael Lubar, K & E employees that worked at the Chatham Facility in the 1950's and 1960's, testified that they had no knowledge of Busch having any involvement in the waste disposal practices at the Chatham Facility. (Manko Dep. at 38:7–12; 34:24 to 35:3 attached as Ex. D to Weider Sup.Cert.; Lubar Dep. at 109:1–4 attached as Ex. E to Weider Supp.Cert.) Neither Manko nor Lubar remember Busch ever visiting the Chatham Facility. (Manko Dep. at 35:12–19; Lubar Dep. at 108:18–20.) Mr. Rosenberg testified that all financial transactions were handled through the headquarters in Hoboken, New Jersey. (Rosenberg Dep. at 143:1–10.) Mr. Rosenberg acknowledged that Busch never participated in any of the budget meetings regarding the Chatham Facility. (Rosenberg Dep. at 143:1–10.)

Plaintiffs instituted this action to obtain contribution from the defendants for clean-up of the site. In count six of the amended complaint, plaintiffs allege Defendant Busch is individually liable under various federal and state environmental statutes and in count eight for contribution under these statutes. Azon, K & E, Robert K. Keller and William G. Keller, asserted cross-claims against Busch for contribution.

Defendant Busch moves for an order granting summary judgment in his favor dismissing all claims and cross-claims against him pursuant to CERCLA. In opposition to the motion, plaintiffs, K & E and Azon (K & E and Azon collectively referred to herein as "defendants") assert that Busch is liable for contribution pursuant to CERCLA and the Spill Compensation and Control Act, N.J.Stat.Ann. § 58:10–11 *et seq.* ("The Spill Act").

## STANDARD OF REVIEW

■ Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *rev'g,* 723 F.2d 238 (3d Cir.1983). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Corp. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir.1976), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

The Supreme Court has explained that in evaluating the evidence presented, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Wahl v. Rexnord*, 624 F.2d 1169, 1181 (3d Cir.1980). When ruling on a motion for summary judgment the court must also consider the relevant burdens of proof at trial. *Celotex Corp. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## DISCUSSION

### A. CERCLA

CERCLA holds the following classes of persons liable:

> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged with a transporter for transport for disposal or treatment, or arranged with a transporter to transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances,
>
> . . . .

42 U.S.C. § 9607. The word "person" includes an "individual, firm, corporation, association, partnership ... commercial entity." 42 U.S.C. § 9601(21).

The only disputed question is whether Alfred Busch can be liable as an "owner or operator" of the Redon Plant under CERCLA, 42 U.S.C. § 9601(20)(A). Busch was a stockholder of K & E which owned the Redon Plant, but absent "piercing the corporate veil," the property of the corporation is its property and not that of the stockholders, as owners. *See Riverside Market Dev. v. International Building Products*, 931 F.2d 327, 330 (5th Cir.1991) *cert. denied sub nom. Riverside Market Ltd. Partnership v. Prescott*, ― U.S. ――, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991); *Levin Metals v. Parr–Richmond Terminal Co.*, 781 F.Supp. 1454, 1455–56 (N.D.Cal.1991). No one has asserted any of the factual elements justifying piercing the corporate veil. Therefore, Busch, as a stockholder, cannot be considered an owner under CERCLA. *Id.* (defendant who owned 85% of the company's stock was not held to be an owner under CERCLA).

It is well-established, however, that in certain circumstances an officer or shareholder of the corporate owner of a facility can be liable as an "operator" under CERCLA even if the traditional requirements for piercing the corporate veil are absent.[1] *Levin Metals v. Parr–Richmond Terminal Co.*, 781 F.Supp. at 1456.

After reviewing all the cases and reading the holdings in the context of the respective opinions, the primary factor considered by federal courts for imposing strict liability on a corporate officer under 42 U.S.C. § 9607(a) is whether the officer personally participated in the disposal or transportation of hazardous substances. *See, e.g., New Jersey Dep't of Environ. Protection v. Gloucester Environ. Management Servs.*, 800 F.Supp. 1210, 1216 (D.N.J.1992) (court held "individual operator defendants may be held personally liable if they had a high degree of personal involvement in the operation and decision-making process"; defendant was held liable because he "was actually in charge of and responsible for the overall management, control and operation of [the] landfill ... he personally was aware of and, on occasion, personally participated in the various violations of the statute ... and that the employees .. engaged in the day-to-day functioning of the sanitary landfill were carrying out and effectuating the policies and procedures prescribed and established by

---

1. The cases setting forth the standard for determining when a corporate officer can be held personally liable under CERCLA are confusing. The confusion is caused in part by some courts citing one standard and then following another. The problem is further compounded by subsequent courts only citing the portions of these earlier opinions that support their positions while ignoring the rest.

[him] as administrator and manager"); *United States v. Northeastern Pharmaceutical and Chemical Co. Inc. (NEPACCO)*, 579 F.Supp. 823 (W.D.Mo.1984), *modified*, 810 F.2d 726 (8th Cir.1986)[2] (president had actively participated in negotiations for waste disposal and plant supervisor, who made the arrangements for waste disposal, frequently reported to president); *United States v. Carolina Transformer Co., Inc.*, 739 F.Supp. 1030, 1037 (E.D.N.C.1989) (defendant corporate officer "personally supervised the day-to-day operations of the business, including ... the handling of PCB-contaminated oil."); *Riverside Market Dev. v. International Building Products*, 931 F.2d at 330 ("The record clearly indicates that [the corporate officer] spent very little time at the asbestos plant, and no evidence [was] presented to indicate that such visits would have provided [him] with the opportunity to direct or personally participate in the improper disposal of asbestos or asbestos by-products."); *Commerce of Massachusetts v. Blackstone Valley Electric Co.*, 777 F.Supp. 1036, 1039 (D.Mass. 1991) ("To hold an officer liable ... he must have personally participated in the conduct that violated CERCLA"; "[defendants] were not personally involved in the storing of hazardous waste."); *United States v. Carolawn Co.*, No. 83–2162–0 1984 WL 21850, 14 Envtl. L.Rep. 20699, 20700 ("CERCLA contemplates personal liability of corporate officials ... who are responsible for the day-to-day operations of a hazardous waste disposal business."); *United States v. Ward*, 618 F.Supp. 884, 894 (E.D.N.C.1985) (defendant was held liable under section 9607(a)(3), as president and principal shareholder, because he "personally arranged for disposal of PCBs by contract with a transporter."); *United States v. Conservation Chemical Co.*, 628 F.Supp. 391, 420 (W.D.Mo.1985) (defendant, as founder, chief executive officer and majority stockholder, was held liable because "[h]e conceived of several waste treatment processes ... [and] [he] considered himself quite knowledgeable about all of the process-es employed at the site."); *United States v. Mexico Feed and Seed Co.*, 764 F.Supp. 565, 569 (E.D.Mo.1991) (defendant, as president and majority shareholder, was held liable under Section 9607(a)(2) because he had "entered into an oral lease agreement ... for the placement ... of waste oil tanks on the site.").

A good illustration of how personal participation is emphasized was presented in *United States v. Northeastern Pharmaceutical Chemical Co. Inc. (NEPACCO)*, 579 F.Supp. 823 (W.D.Mo.1984). When the court was determining whether a corporate officer was liable under Section 9607(a)(2) there were two key considerations (1) the officer's participation in the disposal of hazardous substances and (2) the authority of the officer. In *NEPACCO* the corporate officer actively participated in previous negotiations concerning the disposal of hazardous waste. *Id.* at 849. For the first year the plant was open, the officer personally supervised the construction and operation of the plant. *Id.* Thereafter, he frequently visited the plant to check on its operations. *Id.* He frequently received reports from the plant supervisor, who arranged for waste disposal, concerning the plant's operations. *Id.* The officer was aware of the dangers resulting from exposure to the hazardous substances and was very concerned about establishing and maintaining safety precautions against exposure to these substances. *Id.*

The officer had authority because he was the president, founder and major stockholder of the corporation. *Id.* Based on his authority and his previous active participation in negotiations concerning disposal of the hazardous waste, the court concluded that he had the capacity and general responsibility as president to control the disposal of hazardous waste; the power to direct; the negotiations concerning the disposal of wastes; and the capacity to prevent and abate the damage caused by the disposal of hazardous waste. *Id.*

---

**2.** On appeal the Eighth Circuit held that the officer could not be held liable under 42 U.S.C. § 9607(a)(2) because the place where the hazardous substances were disposed of and where the substances were cleaned-up did not belong to the officer's corporation; therefore, the court concluded that the officer could not be an "owner" or "operator" under the statute. *NEPACCO*, 810 F.2d at 742–743.

Even in the case upon which plaintiffs, Azon and K & E principally rely in arguing for application of the "prevention" test, *Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1532 (W.D.Mich.1989), the court recommended considering the extent to which an individual was involved in the actual waste disposal practices:

> [T]he second factor examines explicit responsibility undertaken—through a job description or more informal acceptance—as a means of determining one's ability to prevent disposal problems: presumably being formally or informally delegated to safely dispose of hazardous wastes increases the probability that one could have a positive effect on disposal practices.

*Kelley v. Thomas Solvent Co.*, 727 F.Supp. at 1544.[3]

Very few federal courts have concluded that an officer "personally participates" based solely on his position, authority or power in the corporation rather than his actual participation in the company's waste disposal process. *See, e.g., State of Vermont v. Staco, Inc.*, 684 F.Supp. 822, 832 (D.Vt. 1988) *rescinded in part vacated in part* (corporate officers "as owning and managing stockholders, are personally liable in their respective executive capacities in the corporate structure"); *see also State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1052 (2d Cir.1985) (court stated that the Section 9601(21) "exception implies that an owning stockholder who manages the corporations . . . is liable under CERCLA as 'owner or operator.' ").[4]

Plaintiffs, Azon and K & E, urge that the primary consideration here should be whether Busch had sufficient control to direct the hazardous substance disposal activities or prevent the damage caused. As discussed above, the cases that support these standards are in the minority. The majority of cases, which should be followed here, hold that the officer should be found personally liable if he participated in the hazardous substance disposal activities. Therefore, the issue presented here is whether Busch personally participated in the Redon Plant's disposal activities.

■ Mr. Juten's general recollection of discussions about waste disposal at the Chatham Facility,[5] the minutes from the May 20, 1964 Chatham Planning Board Meeting coupled with the "Kecotherm" memorandum circulated to Defendant Busch considered together, although not much evidence, comprise sufficient evidence to show that there is a genuine issue of a material fact concerning Defendant Busch's personal involvement in the decision-making process regarding disposal of waste from the Chatham Facility. Therefore, unlikely as ultimate recovery may be, Defendant Busch's motion for summary judgment is denied with respect to the CERLCA claims and cross-claims against him.

B. *Spill Act*

■ The Spill Act was adopted in 1976 before its federal counterpart, CERCLA. Francis E.P. McCarter, *New Jersey Clean Up Your "Act": Some Reflections on the*

---

**3.** However, unlike the cases discussed above, the *Kelley* court explained that "the focus of the inquiry is whether the corporate individual could have used his authority and/or power to control to the hazardous waste discharge at issue." *Kelley*, 727 F.Supp. at 1544.

**4.** Although not relied upon by the *Shore Realty* court to establish liability under CERCLA, at the time the corporation bought the contaminated property, the defendant officer was aware that hazardous substances existed on the property but failed to make a bona fide effort to cleanup prior spills, cleanup the hundreds of thousands of gallons of hazardous waste standing in deteriorating tanks and prevent the growing number of leaking drums. *Id.* at 1039.

**5.** It is not clear from reading Mr. Juten's deposition whether he is testifying from his own personal recollection versus merely reiterating facts he recently obtained from reviewing documents to refresh his recollection. (*See* Juten Dep. at 60–67.) The following dialog between Mr. Grochala and Mr. Juten is a typical illustration of this problem:

> Q. And your recollection, when did that discussion take place?
> A. Took place considering where to go?
> Q. No. About what time period? You've got the Chatham Planning Board minutes here in May of 1964; the plant moves in approximately 1966?
> A. Yeah. It was between those times.
> (*Id.* at 155:4–10.)

*Spill Compensation and Control Act,* 38 Rutgers L.R. 637, 638 (1986). The New Jersey Legislature was concerned about the protection and preservation of the State's lands and waters. *Id.* at 58:10–23.11a; *See generally New Jersey Clean Up Your "Act",* 38 Rutgers L.R. 637. In particular, the Act states that the "discharge of petroleum products and other hazardous substances ... constitutes a threat to the economy and environment of this State." N.J.Stat.Ann. § 58:10–23.11a.

The Spill Act provides that "[w]henever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance...." *Id.* at 58:10–23.11f(2). The Spill Act defines the word "person" to include individuals. *Id.* at 58:10–23.11b(*o*). The Spill Act is to be liberally construed. *Id.* at 58:10–23.11x

Plaintiffs and Busch's co-defendants seek contribution from Busch pursuant to the Spill Act. The only reported New Jersey case related to the issue of individual liability under the Spill Act is *Department of Environ. Protection v. Arky's Auto Sales, et al.,* 224 N.J.Super. 200, 539 A.2d 1280 (App.Div. 1988). In that case, the defendant corporation, Arky's Auto Sales ("Arky's"), owned a site which was unimproved except for an auto wrecking yard or junkyard on about six acres of land. *Id.* at 203, 539 A.2d 1280. Norman and Stanley Arky were twin brothers who were the sole owners and principals of the corporation. *Id.* A sublessee stored full or partially-full used steel drums with warning labels adhered stating poisonous or flammable. *Id.* On one part of the property where drums were readily visible, a fire broke out and drums exploded. On another section, buried ruptured drums were discovered. Test soil samples revealed dangerous contaminant and pollutant levels. *Id.* at 205, 539 A.2d 1280.

The Appellate Division found Arky's, the corporation, liable under the Spill Act, but not the twin brothers as principals. The court found the corporation liable because "[d]espite its knowledge and forewarning of an incipient pollution problem, Arky's did nothing, either by way of supervision or inquiry into the measures taken for cleanup and removal, if any." *Id.* at 207, 539 A.2d 1280. Relying on the "corporate veil" doctrine, the court did not hold the twin brothers personally liable by stating "[i]n the absence of fraud or injustice, courts generally will not pierce the corporate veil to impose liability on the corporate principals."

The *Arky's* opinion supports not holding Defendant Busch liable under the Spill Act. Under the *Arky's* holding, Busch could only be held liable if the corporate veil was pierced. Since no arguments have been presented in support of piercing the corporate veil, Busch can not be held liable under the Spill Act. Although plaintiffs, Azon and K & E have invited me to extend the "ability to control or prevent" standard used to impose liability on corporations to individuals under the Spill Act, I decline to do so.

### CONCLUSION

Defendant Busch's summary judgment motion is granted against plaintiffs' claims and his co-defendants' cross-claims under the Spill Act. However, due to material questions of fact relating to Defendant Busch's personal involvement in waste disposal decisions, Defendant Busch's motion for summary judgment against plaintiffs' claims and his co-defendants' cross-claims under CERCLA is denied.